Filed 12/23/19 (unmodified opn. attached)

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>XAVIER YSAURO MEDRANO et al.,<br><br>　　　Defendants and Appellants. | F068714 & F069260<br><br>(Super. Ct. Nos. VCF282470A–C)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>**[No Change in Judgment]** |

**THE COURT:**

It is ordered that the partially published opinion filed herein on December 3, 2019, and reported in the Official Reports (__ Cal.App.5th __) be modified as follows:

In the unpublished portion of the Discussion, at the end of part **XI. Sentencing Issues**, after the last paragraph on page 79, add the following paragraph:

> In a petition for rehearing, Avellanoza states he has previously been resentenced pursuant to the original opinion filed in 2017 after remittitur issued. Because he has already gone through one resentencing, he posits the "superior court may decline and refuse to bring him back for resentencing" under the new laws. He requests the disposition include the following language: "Since Avellanoza's judgment is not final, his matter shall be remanded for the purpose of considering resentencing under legislation enacted since his original sentencing, including the amendment to section 12022.53, subdivision (h) resulting from Senate Bill 620." We decline this request because we believe the opinion and dispositional language are sufficiently clear that Avellanoza, along with his codefendants, is entitled to consideration for resentencing based on any

new laws now applicable to him, and that the superior court may not refuse him this opportunity when this matter is remanded for further proceedings.

There are no changes in the judgment. Avellanoza's petition for rehearing is denied.

PEÑA, J.

WE CONCUR:


LEVY, Acting P.J.


POOCHIGIAN, J.

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>XAVIER YSAURO MEDRANO et al.,<br><br>    Defendants and Appellants. | F068714 & F069260<br><br>(Super. Ct. Nos. VCF282470A–C)<br><br>**OPINION** |

APPEALS from a judgment of the Superior Court of Tulare County. Valeriano Saucedo and H. N. Papadakis,[†] Judges.[‡]

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Xavier Ysauro Medrano.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant Trinidad Valdez Martinez.

---

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part II of the Discussion, and the Disposition are certified for publication.

[†]Retired Judge of the Fresno Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[‡]Judge Saucedo ruled on the People's motion to dismiss the case just prior to the original date set for trial. Judge Papadakis presided over the defendants' trial and sentencing.

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant Rey Robert Avellanoza.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna, Julie A. Hokans, and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

–ooOoo–

## INTRODUCTION

Defendants Xavier Ysauro Medrano (also known as Xavier Ysidro Medrano), Trinidad Valdez Martinez, and Rey Robert Avellanoza were found guilty after a jury trial of attempted murder, burglary, assault with a firearm, and participation in a criminal street gang. Avellanoza was found guilty of shooting into an inhabited dwelling; Medrano and Martinez were acquitted of this charge. Enhancements alleging premeditation and deliberation, use of firearms, causing great bodily injury, and committing the offenses for a criminal street gang were also found true by the jury. Each defendant received a substantial state prison sentence, including an indeterminate sentence for the attempted first degree murder conviction. The defendants were only partially successful in their appeal of the judgment.

On February 1, 2017, the California Supreme Court granted Medrano's and Martinez's petitions for review pending consideration and disposition of *People v. Mateo*, S232674. The Supreme Court denied Avellanoza's petition for review (remittitur issued Feb. 7, 2017). On April 10, 2019, the California Supreme Court returned the case to us with directions to vacate our opinion and reconsider the cause in light of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). In connection with the Supreme Court's transfer, the remittitur pertaining to Avellanoza was recalled on October 8, 2019. In supplemental briefing, Martinez and Medrano now argue the recent enactment of Senate Bill 1437 requires reversal of their attempted murder convictions because the jury instructions and the prosecutor's arguments allowed the jury to convict them on the now

2.

repudiated theory that attempted murder was a natural and probable consequence of aiding and abetting assault likely to cause bodily harm and because Penal Code section 188 no longer permits imputed malice. (Undesignated statutory references are to the Penal Code.) Relatedly, they argue Senate Bill 1437 applies to charges of attempted murder and that relief should be available through direct appeal, rather than limited to the petitioning procedure provided for in newly enacted section 1170.95. Martinez further contends the trial court should be permitted to exercise its newfound discretion to strike or dismiss the firearm enhancements imposed pursuant to sections 12022.5 and 12022.53 (Sen. Bill No. 620 (2017–2018 Reg. Sess.) [Senate Bill 620]), and the five-year prior serious felony enhancement imposed pursuant to section 667 (Sen. Bill No. 1393 (2017–2018 Reg. Sess.) [Senate Bill 1393]).

In the published part of this opinion, we find merit to the new claims pertaining to the natural and probable consequences doctrine as to Medrano and Martinez. We conclude Senate Bill 1437 not only abrogated the continuing application of this doctrine to murder charges, we further determine this change in the law applies to attempted murder charges premised on this doctrine. In doing so, we part company with our sister courts in *People v. Lopez* (2019) 38 Cal.App.5th 1087, review granted November 13, 2019, S258175, and *People v. Munoz* (2019) 39 Cal.App.5th 738 (*Munoz*), review granted November 26, 2019, S258234. However, we agree with *Lopez* and *Munoz* that the petitioning procedure added in section 1170.95 does not apply to attempted murder. Because the section 1170.95 petitioning procedure does not apply to defendants for their convictions of attempted murder, we review their claim under *In re Estrada* (1965) 63 Cal.2d 740 and conclude defendants are entitled to relief on direct appeal. Thus, we reverse the judgments of conviction for attempted murder as to Medrano and Martinez.

In the unpublished part of the opinion, as to all three defendants, we reverse the gang convictions and the gang enhancements. At resentencing, the court shall consider

3.

whether to exercise its discretion pursuant to Senate Bills 620 and 1393, if applicable to any defendant. In all other respects, the judgments are affirmed.

*Initial Proceedings*

An information was filed on May 22, 2013. On July 18, 2013, the trial court denied defendants' motions to bifurcate the gang allegations and evidence. The first trial ended in mistrial on July 24, 2013. A second jury was sworn and the case commenced on July 30, 2013. On August 9, 2013, the trial court denied the motion of Medrano and Martinez to sever their case from the case against Avellanoza.

*Jury Verdicts*

On August 9, 2013, defendants Medrano, Martinez, and Avellanoza were all convicted of attempted murder (§§ 664, 187, subd. (a); count 1), first degree burglary (§ 459; count 2), assault with a deadly weapon, a firearm (§ 245, subd. (a)(1); count 4), and street terrorism (§ 186.22, subd. (a); count 5). Avellanoza was convicted of shooting into an inhabited dwelling (§ 246; count 3); Medrano and Martinez were acquitted of this charge.

The jury found true conduct enhancements that all three defendants committed attempted murder willfully, deliberately, and with premeditation. The jury found true that in committing count 1, Medrano and Martinez had violated section 12022.53, subdivisions (b) and (c) for personal use of a firearm as alleged in count 1, but did not find true Medrano and Martinez acted as principals or caused great bodily injury to the victim pursuant to section 12022.53, subdivisions (c), (d), and (e)(1). The jury found true the allegations Avellanoza personally used a firearm in count 1 within the meaning of subdivisions (b) and (c) of section 12022.53, he acted as a principal, causing great bodily injury within the meaning of subdivisions (c), (d), and (e)(1) of section 12022.53, and he inflicted great bodily injury pursuant to section 12022.7, subdivision (a). The jury found

---

[*]See footnote, *ante*, page 1.

true the allegations all three defendants used a gun within the meaning of section 12022.5, subdivision (a) as to counts 2, 4, and 5, and all three defendants acted in counts 1 through 4 for the benefit of a criminal street gang in violation of section 186.22, subdivision (b)(1)(C).

In a bifurcated proceeding, the trial court found true allegations that Martinez was subject to status enhancements for committing four prior strikes pursuant to the three strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), suffering four prior serious felony convictions (§ 667, subd. (a)(1)), and serving five prior prison terms (§ 667.5, subd. (b)).

*Sentencing*

Medrano and Martinez were sentenced on December 19, 2013. Medrano received an indeterminate prison term of 15 years to life for attempted murder (count 1), plus a determinate sentence of 20 years for the section 12022.53, subdivision (c) gun enhancement. The abstract of judgment does not indicate a sentence for the gun enhancement. Medrano was sentenced to a consecutive term of four years for first degree burglary (count 2), plus 10 years for the section 186.22, subdivision (b)(1)(C) gang enhancement, plus four years for the section 12022.5, subdivision (a) gun enhancement. Medrano's sentences for assault with a deadly weapon (count 4) and the related enhancements were stayed pursuant to section 654. The court imposed the midterm of two years for the substantive gang offense plus four years for the section 12022.5, subdivision (a) gun enhancement, with both sentences to be served concurrently. Medrano's total determinate sentence is 38 years.

The trial court noted Martinez had two or more prior serious or violent convictions and sentenced him to an indeterminate term of 15 years to life, multiplied by three pursuant to the three strikes law, for a term on count 1 of 45 years to life. The court imposed an additional consecutive sentence on count 1 of 20 years for the section 12022.53, subdivision (c) gun enhancement. The court sentenced Martinez on count 2 to

a consecutive term of 25 years to life plus consecutive terms of 10 years for the gang enhancement, five years for the prior serious felony enhancement, two years for each of two prior prison term enhancements, and four years for the section 12022.5 gun enhancement. The court stayed Martinez's sentence on count 4 as well as the related enhancements on that count pursuant to section 654. The court ordered Martinez to serve a term of four years doubled on count 5 plus four years for the section 12022.5, subdivision (a) gun enhancement, to run concurrent to his indeterminate sentence. The remaining enhancement allegations in count 5 were stayed pursuant to section 654. We note there are several clerical errors in the abstract of judgment prepared for Martinez.

On February 26, 2014, the trial court sentenced Avellanoza to an indeterminate prison term of 15 years to life on count 1 plus 25 years to life for the section 12022.53, subdivision (d) enhancement for gun use causing great bodily injury. The court imposed a prison term of six years on count 2 plus consecutive terms of three years for the section 12022.7, subdivision (a) great bodily injury enhancement, 10 years for the section 186.22, subdivision (b)(1)(C) gang enhancement, and four years for the section 12022.5, subdivision (a) gun enhancement. The court imposed a three-year concurrent sentence on count 5. Avellanoza's total determinate sentence on count 2 is 23 years. Although count 2 is the burglary charge, the abstract of judgment inaccurately lists count 2 as attempted murder. Avellanoza's sentences on counts 3 and 4 were stayed pursuant to section 654.

FACTUAL BACKGROUND[*]

### Shooting Incident

In November 2010, Michael Machado, Jr., was living in a mobilehome next to his father's house on a five-acre parcel in Earlimart. Machado described Earlimart as a small community where "all the people know each other." Machado ran a trucking business on the property with his father. Machado was growing what he described as medical marijuana plants in a room on the west side of his mobilehome and in the kitchen area.

---

[*]See footnote, *ante*, page 1.

Machado grew the plants with bright 600-watt high sodium lights that stayed on 24 hours a day.

Between 10:45 and 11:00 p.m. on November 24, 2010, Machado heard a truck, looked outside, and became alarmed because he recognized a gray stepside Chevrolet driving by his home at a slow speed. Machado went back in his home after seeing nothing out of the ordinary. Ten to 20 minutes later a confrontation occurred. Machado said he did not recall everything exactly because it had been years since the events of that evening. Machado heard multiple loud footsteps on his porch. Because it was a manufactured home, it was light and the sound of the footsteps was amplified. Also, the home was older and poorly insulated.

Machado had a 12 gauge shotgun leaning against the closet loaded with dove shot, "really a light load." Machado heard someone say "FBI" just before kicking in the door and entering. Within seconds, the door to the marijuana grow room was kicked down and then the door to Machado's bedroom was kicked down. Since it was Thanksgiving week, Machado thought the chance it was the FBI entering his home was slim. Machado rolled out of bed, grabbed the shotgun, and crouched down next to his bed. As the assailants entered Machado's home, he was crouched down on the right side of a couch in between his bed and the closet. Machado could see the assailants standing in the doorway. The assailants were about 30 feet away from Machado, and he subsequently identified them as defendants. All three defendants wore black attire and hats.

Machado told Detective Judd Hembree he had been positioned next to the coat rack, which was Machado's closet. Machado told Detective William Meek he had been between the bed and the closet area, "mid way through the bed and mid way through the closet." During his preliminary hearing testimony, Machado had said he was "'on the ground in the closet,'" but later clarified at trial he was next to the closet. At trial, Machado explained the detectives had determined Machado's estimate was off one foot from what he had described to them, and he had not tried to lie about his location.

7.

Machado saw Avellanoza standing in the doorway and was familiar with him because on a prior occasion he had caught Avellanoza breaking into a neighbor's garage. Machado had seen Avellanoza underneath his neighbor's classic 1960's car trying to strip it. On that occasion, Machado drew a gun on Avellanoza and made a citizen's arrest until law enforcement arrived.

When defendants came through the home and knocked down Machado's bedroom door, it hit a television before landing on the floor. Avellanoza, who was armed with a semiautomatic pistol, pointed the gun at Machado and fired. Machado believed he fired his shotgun simultaneously and did not want to split hairs about who fired the first shot.

Machado felt the shots fired all around him. Events happened very fast. Three or four bullets grazed his body but only one bullet penetrated him, going straight through his shoulder. The wound bled a little. Machado did not seek medical attention for the wound because he was too afraid for his family's safety to leave the property. Investigating deputies took pictures of the wound an hour or an hour and a half after the incident. A photograph depicting Machado's injury was admitted as exhibit 17. The wound became infected, was painful, and limited Machado's activity for a few days.

Both of the interior doors of the mobilehome had been knocked completely off the hinges, which made Machado's view into the grow room "a thin but clear view." Machado saw Medrano and Martinez in the grow room. Machado also recognized them from prior encounters.[1] Medrano and Martinez were each carrying handguns. Additional gunfire was directed toward Machado through the wall of his bedroom by defendants as they exited the home.

Machado further described his view of Medrano and Martinez as a "glimpse." After the shots were fired, Machado could see Medrano and Martinez fleeing from the

---

[1]On one occasion Machado was exiting a convenience store as Medrano and Martinez were entering it. Martinez made a gesture toward Medrano and two kids, who then jumped on Machado. When bystanders tried to help Machado, Martinez pulled out a gun and the bystanders backed away.

grow room.  Machado elaborated that he saw Medrano and Martinez for a "split second," but this was all he needed to identify them.  After they left the grow room, Machado heard someone say, "'Go back in,'" or "'Go back in and get him.'"  In his preliminary hearing testimony, Machado had testified he heard someone say, "'Go back in and get that fool.'"  Machado believed it was Martinez who made this comment.

Machado was trying to maneuver himself out of the bedroom while ducking and dodging bullets.  He exited the room from a window not far from where he had been crouched.  Although Machado's shotgun became jammed, he was able to clear it while exiting through the window.  A fourth gunman standing by a tree started shooting at Machado.  Machado fired back at him.  Machado's elbow got skinned and he was in a panic.  Machado saw four or five people jump into a white car and drive away.  Machado was not certain, but believed he placed his shotgun in a vehicle he owned.

Machado did not immediately tell officers the names of the assailants until later in the first day of the investigation.  Machado explained it took a while to build the courage to tell investigating officers the identities of the assailants because he was still worried about his family's safety.  Machado's father testified he remembered his son remarking after the incident that he did not see the assailants, and he had not identified (to his father) who they were.

### Investigation

Detective William Meek of the Tulare County Sheriff's Department investigated the shooting incident.  Meek found and photographed wadding from fired shotgun shells and casings from different caliber gun ammunition in Machado's mobilehome.  The wadding came from 12 gauge shotgun ammunition.  Inside the bedroom closet area there was 12 gauge wadding and some birdshot.  Casings in the home and within the fenced area of the home came from nine-millimeter, .40-caliber, and .45-caliber ammunition.

Photographs of bullet holes in the walls of the dining room and in the master bedroom closet wall shared between the two rooms, as well as in the walls of the living

9.

room, washroom, kitchen, master bedroom, and hallway were admitted into evidence. Patterns of some of the holes in the bedroom closet were consistent with bird shot pellets. Photographs of damage to the front and interior doors of the home were also admitted into evidence. The grow room lighting in the mobilehome provided sufficient light for Meek without having to use his flashlight. Three separate shoe tracks were discovered by tire tracks near the roadway.

Meek attempted to mimic Machado's position in the bedroom based on what Machado had told him. At first, Meek was unable to see the grow room from the position Machado described. Meek further explained that from a point between the end of the mattress and the first opening of the closet, through a small open space, he could see into the grow room by peeking around "a little bit."

At one point, Machado told Detective Hembree he did not recognize any voices during the assault and he could have been killed by federal agents. Hembree further explained, however, this was at the beginning of the assault when Machado heard someone yell "FBI." Machado's comment about not recognizing voices did not refer to the end of the incident. When questioned by investigators, Machado positively identified all three assailants in photographic lineups.

Detective Hembree walked through the crime scene. Detective Meek was arriving at the scene about the same time. An umbrella grow light was suspended above the marijuana plants in the kitchen area and it emitted ambient light as Hembree walked through Machado's home. Hembree could see well throughout the home without additional light. There were grow lights next to Machado's bedroom that were also very bright. The bedroom door was broken off its hinges and was propped up against the wall. There was light emanating from the grow room into the bedroom, especially with the door open.

Machado did not give Detective Hembree a description of the getaway car. Machado had described the fourth gunman to Hembree as a shadowy figure. Detective

Travis Shaw talked to Machado almost a month after the incident. At that time Machado described to Shaw a specific car he had seen driving by his home since the incident, a white Honda Civic with black rims. Machado suspected his assailants were connected in some way to the Honda. Machado explained to Shaw that Antonio Valdez, also known as Peanut, drove a white Honda.

From a photographic lineup, Machado identified the fourth individual by the tree as Peanut. Machado admitted he only caught a glimpse of Valdez from 30 or 40 feet away, and he had been helped in identifying him by his "guy on the street." Machado told Shaw he had seen Valdez the day of the incident and "he had talked to a friend of his who was … helping him out" in describing Valdez, and this was how Machado got Valdez's name.

A search warrant was executed at Medrano's residence on November 30, 2010. Investigators found in Medrano's bedroom a flag depicting a "Huelga bird," a computer screen with the same symbol, a "Nor Cal" flag with a red stripe on the bottom, and drug paraphernalia. Investigators also found a box of ammunition, other live rounds of .38-caliber and .357-caliber bullets, and a holster that could fit firearms of .380-caliber, nine-millimeter, .40-caliber, or other short-barreled guns. There was also a radio scanner in the room used to monitor police and fire channels.

On November 30, 2010, investigators also executed a search warrant at Martinez's residence. Detective Chad Bruce went to Martinez's bedroom where he found a marriage certificate in Martinez's name and a suitcase in the closet with mail addressed to Martinez. Bruce went to Oscar Tellez's room in the same residence and found a collage-style drawing "with a female's face, a clown wearing … a fedora, … a guy wearing a sombrero with [the word] Tellez across the brim." Bruce also photographed and collected from Martinez's room a drawing with the name "Trino" on the bottom right corner with "05" next to it and a clown with a little star on its earlobe. The star is a common symbol among Northerner gang members.

11.

In Tellez's room, Bruce collected a photograph of nine males shown drinking beer. One person in the group was "throwing" gang signs. Martinez was in the picture wearing a red shirt.

When the search warrant was executed, Detective Hembree questioned Martinez in front of his home after Martinez was in custody and had been given and waived his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Martinez said the day of the shooting was his wife's birthday and they had dinner at Olive Garden in Visalia, had a few drinks, and came home for a few more drinks. Martinez left home to get something more to eat, then came back home for the rest of the evening. During the initial questioning, Martinez did not indicate he left his home a second time to eat again. When later questioned, Martinez added that he left his home a second time to go to Sonic, but came right back home. When asked his gang affiliation, Martinez said, "'I'm still down as a Northerner.'"

### Gang History and Background Evidence

Detective Steven Sanchez testified as the People's gang expert. Sanchez had been a police officer just over nine years and spent the previous year with the violent crimes unit and the four years prior to that with the gang violence suppression unit. Sanchez had advanced training relating to gangs, 300 hours of Police Officers' Standards and Training, and attended state and national conferences on gangs. Sanchez attended several separate classes on Northerner gangs and the Nuestra Familia. Sanchez was also a member of the Central California Gang Investigators Association, the California Gang Investigators Association, and the California Gang Task Force where he attends meetings to learn about current trends with gangs and who is in charge of them.

Sanchez explained the Nuestra Familia was the founding prison gang for the Norteños gang. A current trend with gangs is for them to tax drug dealers selling in their area and to send these funds to jails to provide money to inmates for attorneys, food, and

12.

the commissary. The collected funds are also used to move weapons and narcotics, as well as to establish safe houses to store drugs and weapons.

Sanchez worked in the jail for two and a half years and became familiar with gang tattoos, gang operations in jails, and how gang members communicate with inmates. For a year and a half on patrol, Sanchez worked in Ivanhoe, where there are primarily Southerner gangs, and Goshen, where there are primarily Northerner gangs, familiarizing Sanchez on how the gangs operate on the streets. In the gang unit, Sanchez's primary duty was to document gangs. This made him familiar with everything gang members do, from the music they listen to, the clothes they wear, who they associate with, their enemies, the area they claim, and the signs and symbols they use. Sanchez had consensual contacts with gang members resulting in conversations where he gained much of his knowledge.

Sanchez had investigated over 100 crimes involving the Norteño gang. In the late 1950's, a Sureño gang, La Eme, was formed in the prison system. In the mid-1960's disaffected La Eme gang members who had become tired of politics that did not allow them control of the drug trade formed Nuestra Familia, which founded the Norteño prison gang. The Nuestra Familia and Norteños have a chain of command. Norteño territory has traditionally been from Delano north. Tulare County has been traditionally a very Northerner-affiliated county. The Norteños traditionally claim the color red and the Sureños the color blue. Norteños wear team colors like those of the '49ers and Giants sports teams and also wear Nor Cal clothing.

The Norteños use the hand gestures of one and four to represent Roman numeral XIV, and use the letters NS for North Side. They also use these symbols in graffiti. The Huelga bird is another Norteño symbol. Some of the primary activities of the Norteño gangs include homicide, assault with deadly weapons, carjacking, robbery, narcotics sales, and possession of firearms.

13.

Sanchez explained that in Norteño gang culture, respect and advancement within the gang and with rival gangs are achieved by committing illegal activities, assaulting rival gang members, and causing fear. People who testify against Norteños are considered snitches, and the gang will do everything possible to get rid of such a person to stop further cooperation with law enforcement.

The California Department of Corrections and Rehabilitation (CDCR) has identified seven validated prison gangs, including Nuestra Familia. When prison authorities in the 1980's began to lock down gang members, Nuestra Familia created a faction called Nuestra Raza (referred to by prison officials as the "Northern Structure") to carry out their crimes. Ultimately, the Nuestra Familia controls all of the activities for the Norteño gang. The Nuestra Familia has a paramilitary structure with generals, lieutenants, and regimental commanders who control everything from prison out onto the streets. Sanchez personally executed a search warrant of a residence in Goshen with a safe containing 400 prison "kites," the gang's constitution, the gang's 14 bonds, and a list of how to send money to generals incarcerated in Pelican Bay prison.

When a gang member is convicted of a gang crime, he or she has to register with law enforcement as a gang member pursuant to section 186.30. The gang member receives a "STEP notice" that he or she is a member of the gang, the gang commits illegal activities, and the gang member has to continue registering as a member of that particular gang. Detective Sanchez explained it was becoming more common to find gang members who are not "flying their colors," do not have tattoos, and are not wearing gang clothing because gang members are more aware of gang injunctions being issued in Tulare County.

The Tulare County Sheriff's Department has adopted 10 criteria from the California Department of Justice to demonstrate someone is a documented gang member. To be considered a gang member, the person must meet three of the criteria. The 10 criteria are that the person: associates with gang members, admits gang membership,

14.

admits being a gang member in a custodial facility, wears gang clothing or attire, wears such attire in or possesses gang photographs, writes gang material, possesses gang material, identifies as a gang member in correspondence with another gang member, is identified as a gang member by a reliable source, and has gang tattoos.

### *Predicate Offenses*

The predicate offenses committed by the Norteño gang, shown by certified documentation of prior convictions (exhibits 125 & 126), included an assault with a deadly weapon with a gang enhancement by Norteño gang member George Lua on October 18, 2008. Detective Sanchez himself participated in the arrest of Lua. The second predicate offense occurred on April 10, 2010, when Norteño gang member Salvador Mendoza committed an attempted murder and was charged with that and a gang enhancement. The crime occurred during an altercation between Norteño gang members and a Southerner dropout. No objections were lodged to the admission of exhibits 125 and 126 or to Detective Sanchez's testimony.

### *Evidence of Medrano's Gang Affiliation*

Sanchez conducted research on Medrano's gang activity, reviewing documents pertaining to a drive-by shooting incident on March 24, 2006. Deputies with the Tulare County Sheriff's Department were dispatched to a residence belonging to Juan Marquez, a member of the Norteños. Marquez's mother told detectives a shooting occurred at the residence because of her son's gang affiliation.

In September 2006, sheriff's deputies were dispatched to a residence belonging to a Sureño gang member who identified Medrano and fellow Norteño Tommy Corrales as shooting at him with a shotgun as he drove by Medrano's residence. A search warrant was executed at Medrano's residence where deputies found Norteño graffiti and shotgun shells. This information demonstrated to Sanchez that Medrano was both the victim of a gang-related crime and a member of the Norteño gang.

15.

In November 2006 there was a report of a drive-by shooting at Medrano's residence. Detectives contacted a witness who observed a Norteño gang member get into a car at Medrano's residence and flee the area. There was yet another drive-by shooting at Medrano's residence on December 14, 2006. In September 2009, Medrano was contacted by Officer Chavez of the California Highway Patrol. During the investigation, Chavez "documented Mr. Medrano as having north gang affiliation."

Detective Sanchez was shown exhibit 98, booking information on Medrano indicating he was affiliated with the Norteño gang. The classification was prepared by a correctional deputy, and Sanchez did not know if the classification was based on a statement by Medrano.

Turning to the evidence found in Medrano's residence during the execution of the search warrant, Sanchez noted that detectives, including himself, found multiple items showing indicia of Norteño gang affiliation. Medrano was displaying a Nor Cal flag, a Huelga bird flag, and a computer screen image of "North Side Pixlon" showing his allegiance to the gang. North Side Pixlon is a documented subset of the Norteño gang. A PlayStation 3 was connected to a monitor. Sanchez personally listened to audio files stored on the hard drive of the PlayStation 3 and heard Norteño gang lyrics with gang slurs disrespecting rival gangs. One example was the derogatory term "scraps" in a lyric referring to the rival Sureño gang. Three other people lived in Medrano's residence. Other family members indicated the room where gang indicia was found was Medrano's room. Based on all this information, in Sanchez's opinion Medrano was a member of the Norteño gang.

### Evidence of Martinez's Gang Affiliation

Two weeks prior to trial, Sanchez was present when photographs of Martinez's gang tattoos were taken and admitted as exhibits 127, 128, 129, and 130. Among the tattoos on Martinez were "Norte," "X4," the northern star, and "EARLA," an abbreviated name for Earlimart. Exhibit 131 depicted a Huelga bird tattoo and exhibit 132 was a

16.

tattoo depicting a female with a headband bearing the Roman numeral "XIV." Exhibit 133 was a photograph of a tattoo depicting a female with a red bandana across her head with the initials "NS" within the bandana. The letters "NS" represent the North Side. Exhibit 134 was a photograph of a tattoo depicting a bear, emblematic of Northern California and found on Nor Cal clothing.

Sanchez also reviewed documents from the CDCR, previous police reports, and field identification cards related to Martinez. In 1997, Martinez was arrested in the company of Misiel Guzman, a Norteño gang member. Martinez filled out a classification questionnaire indicating Sureño and Bulldog gang members were his enemies. Sanchez "located documents indicating Mr. Guzman was previously a member of the northern structure gang." Documents from CDCR prepared in October 2002 and November 2008 stated Martinez was then an active member of the Nuestra Raza Norteño gang.

In October 2007, Martinez was a passenger during a traffic stop of Norteño gang member Jorge Ceballos. A loaded .45-caliber handgun and three ounces of methamphetamine were found in the front passenger glove box. Investigators also found another ounce of methamphetamine and $10,000 in cash. Martinez filled out a gang questionnaire stating he was associated with Northerner gangs. While in custody in May 2009, Martinez admitted being a member of the Northerner gang. In January 2010, while with Norteño gang member John Escalera, Martinez admitted to law enforcement he was a Northerner gang member.

In November 2010, Martinez was ordered to register as a gang member with the Tulare County Sheriff's Department after being served with a STEP notice. Sanchez saw a photograph depicting Martinez with another male and a female obtained after the execution of a search warrant of Martinez's residence in November 2010. The male was flashing the Northerner gang hand sign "4" and wearing a reddish-color Giants jersey. As noted earlier, after being given his *Miranda* rights when he was arrested, Martinez said he was a Northerner gang member.

17.

Martinez reviewed a report by a witness, Melesio Valdez (also referred to as Melesio Valdez Duran and M.V. during trial), who spoke to Detective Zaragoza. Valdez reported to Zaragoza that Martinez was a shot-caller for the gang, involved in the collection of money for the gang, and directing orders. Shot-callers give permission to fellow gang members to carry out gang activities and are also in charge of sending money to high-ranking gang members.[2]

*Evidence of Avellanoza's Gang Affiliation*

Relying on documentary evidence, Sanchez stated that in June 2008, sheriff's department deputies conducted a traffic stop of a vehicle possibly involved in an assault. Avellanoza completed a classification questionnaire in which he self-admitted being a Northerner associate and stated his enemies were Southerners. Reading from another police report, Sanchez testified that on May 29, 2009, Delano Police Department officers were dispatched to investigate an allegation Avellanoza and fellow Norteño gang member Antonio Valdez assaulted a victim in an ongoing dispute over a girlfriend. Avellanoza struck the victim in the left eye. Valdez and Avellanoza were brandishing a firearm.

Another report from the Tulare County Sheriff's Department indicated on June 12, 2009, Avellanoza allegedly brandished a firearm. According to the victim, Avellanoza asked the victim why he was wearing a blue shirt and called the victim a scrap. The victim reported Avellanoza pulled a firearm from his waistband. The victim later requested no charges be filed against Avellanoza. According to Sanchez, this showed Avellanoza's activity in the gang and his desire to confront a perceived member of a rival gang. Sanchez explained it was very common for victims not to seek charges against

---

[2]There was a lengthy hearing outside the presence of the jury in which counsel for Martinez and Medrano challenged the admissibility of the "shot-caller" testimony as being inadmissible hearsay and asserted its introduction violated Evidence Code section 352. The court found this evidence was hearsay that an expert could testify about. The trial court further found that although the evidence was prejudicial, its probative effect outweighed the prejudice.

gang members out of fear of retaliation. On November 30, 2009, a victim reported to the Tulare County Sheriff's Department that Avellanoza and three other fellow gang members took the victim's personal property. When the victim tried to confront the four, he heard a gun being racked with a round in the chamber. The victim fled.

On February 21, 2011, Sanchez was a member of the Tulare County Sheriff's Department SWAT team. He was dispatched with the SWAT team to a motel in Tulare to execute an arrest warrant on Avellanoza. Avellanoza eventually surrendered and was arrested. A booking information form or classification questionnaire, exhibit 97, was introduced into evidence. Avellanoza listed on the form that he associated with the Northerner criminal street gang. Sanchez opined Avellanoza was a member of the Norteño gang based on the three criteria: he associated with gang members, he was involved in gang-related crime, and he self-admitted gang affiliation in a custodial facility.

### Hypothetical Based on Mirroring of Evidence

Sanchez was asked, hypothetically, if three documented gang members were to kick in the door of someone's residence and start shooting at the victim, including through the walls of the victim's dwelling, would they be doing so in association with the Norteño street gang. Sanchez replied affirmatively to this question. Sanchez was asked if after such a shooting a shot-caller told the shooter to go back in "to finish the victim," would the scenario be for the benefit of the Norteño street gang. Sanchez replied it would be at the direction of the gang.

When asked whether there was a connection to a street gang when the victim had previously reported one of the shooters to law enforcement, Sanchez again replied affirmatively. Sanchez elaborated, explaining a person cooperating with law enforcement is considered a snitch, and reporting an incident is a sign of disrespect. The purpose of committing a violent assault is to instill fear to prevent testimony against members of the gang. A victim who had prior physical altercations with gang members would be in an

19.

ongoing feud, also showing disrespect of the gang member and the gang. Such a crime would assist, promote, and further the gang based on the fact a message was being sent to the victim, as well as the community, that gang members will not tolerate disrespect.

*Medrano's Defense*

Medrano's mother, Cecilia Chavez, testified the United Farm Workers' flag with the Huelga bird found in Medrano's garage belonged to her. It previously belonged to her father, who had designed the symbol. Medrano's mother was unaware of any gang connotation with the image of the bird. Medrano's friend, Maria Silva, testified she spent the night of November 25, 2010, Thanksgiving evening, with Medrano. Silva did not see Medrano the evening of November 24, 2010.

*Martinez's Defense*

Martinez's wife, Jessica Martinez, admitted she had a prior conviction requiring her to register as a gang member. Jessica Martinez testified she recalled November 24, 2010, because it was her birthday, and she went out to dinner between 5:45 and 6:00 p.m. with her husband, her daughter, and two nieces to the Olive Garden in Visalia. The drive to Visalia from Earlimart takes about 40 minutes. They returned home between 9:00 and 9:30 p.m. that evening. After leaving the home a few minutes later to get ice cream at Sonic and returning at 9:45 p.m., the family went to bed and Martinez never left the house again that evening.

Martinez's mother, Lupe Tellez, confirmed the activities of Martinez on November 24, 2010, as related by Jessica Martinez. She believed her son was a member of the Northerner gang.

*Avellanoza's Defense*

Avellanoza's girlfriend, Leonora Penalosa, and her brother, Robert Penalosa, testified for Avellanoza.[3] During Thanksgiving 2010, Avellanoza was living with the

---

[3]Because Robert and Leonora Penalosa share the same last name, we refer to them by their first names. No disrespect is intended.

20.

Penalosa family.  Robert and Avellanoza worked at the same place five days a week.  The two would carpool into work in Robert's car.  On Thanksgiving morning, Robert and Avellanoza went to work around 5:00 a.m. and returned home between 3:30 and 4:00 p.m.  Robert had Thanksgiving dinner with Avellanoza at their home.  Robert never saw Avellanoza with weapons or drugs.

Leonora said she dated Avellanoza for about six years.  In February 2010, he moved into her home.  While he lived with the Penalosa family, Avellanoza worked in the fields with Robert.  Avellanoza worked all weekdays.  The evening before Thanksgiving 2010, Avellanoza was with Leonora.  On Thanksgiving morning, Avellanoza went to work.  Leonora knew Medrano and Martinez, but she and Avellanoza did not associate with them.  Leonora was aware of arguments Avellanoza had with Machado.  Avellanoza never threatened Machado, did not pull a gun on him, there was no gun in the Penalosa residence, and she did not think Avellanoza was a violent person.

On cross-examination by the People, Leonora admitted she was aware from newspaper accounts that Avellanoza was identified as the shooter of a Sureño gang member in Bakersfield who later died.  This did not change Leonora's opinion that Avellanoza was not a violent person.

### People's Rebuttal Evidence

Detective Hembree did not recall Martinez or his wife saying anything about going to a Sonic restaurant the evening of November 24, 2010.

Prior sworn testimony from Guillermo Barajas, who was unavailable as a witness at trial, was read into the record.  Barajas was with friends and family, including Avellanoza, at The Dome in Bakersfield in 2011.  Barajas was "jumped" by several guys and knocked out.  Sergeant Martin Heredia with the Bakersfield Police Department investigated the incident.  Words were exchanged between Barajas's group and Southerners.  They went outside where a fight occurred.  Avellanoza was seated in an

SUV and fired shots from it as the SUV left the scene. One person was shot and Heredia saw him at the hospital afterward.

## DISCUSSION

### I.      Dismissal of Original Information[*]

#### A.      Introduction

Martinez and Avellanoza, joined by Medrano, contend the trial court erred in allowing the prosecutor to dismiss the original information set forth in case No. VCF245417. Defendants argue that after they successfully filed a motion to bifurcate the gang allegations, the prosecution moved to dismiss the original information as a pretext in order to have the case sent to a new judge. According to defendants, the prosecutor was forum shopping for a different ruling. Defendants attribute ill motive to the prosecutor because he immediately filed a new substantive gang allegation, and they argue his conduct was akin to a vindictive prosecution that, in turn, denied them their right to due process under law. We reject these contentions.

#### B.      Pretrial Proceedings

On April 18, 2013, prior to the original date set for trial, there was a pretrial hearing before the Honorable Valeriano Saucedo. There was discussion concerning the prosecutor's attempt to arrest Melesio Valdez, a potential witness who would testify concerning the motive of the Norteño gang to collect taxes from the victim. Defendants sought to bifurcate the gang issues. The court indicated it was inclined to grant defendants' motion to bifurcate the gang issues. The prosecutor argued the court was applying the wrong legal standard. The court held the prosecutor could show during an Evidence Code section 402 hearing whether the statements attributed to Valdez were reliable and appropriately memorialized in a way an expert could rely upon them.

The court noted it was aware of prior negative interactions between Machado and defendants. The court ruled if Machado testified untruthfully that he had no prior contact

---

[*]See footnote, *ante*, page 1.

22.

with defendants, the court would reconsider its ruling and permit the challenged information into evidence for impeachment purposes after it was sanitized of inappropriate gang references. The court found no gang overtones in the shootout and granted defendants' motion to bifurcate the gang issues.

The prosecutor brought a motion for reconsideration of the bifurcation issue on April 23, 2013. The court reiterated its concern there was no evidence of an attempt by the Norteño gang to collect taxes because Machado was growing marijuana in gang territory. The court proceeded to rule on other motions in limine. To alleviate the potential for biased jurors on the bifurcated gang enhancements, all defendants were willing to waive a jury trial on the enhancements. The prosecutor stated he was unsure if he was also willing to waive a jury trial on the gang enhancement allegations but wanted time to consider the matter. The court deferred its ruling on the motion to waive a jury trial on the gang enhancements.

On the date originally set for trial, April 29, 2013, the prosecutor indicated he was not ready to proceed and moved for dismissal of the case because despite diligent efforts, the People could not serve two witnesses in the case, including Machado. The prosecutor did not want to try the case based on Machado's preliminary hearing testimony. The prosecutor stated he intended to refile the charges. Counsel for each defendant strenuously objected to the motion. Judge Saucedo stated he did not believe the prosecutor's motion was directed to the court's ruling on the bifurcation of the gang enhancements. Judge Saucedo granted the motion to dismiss. The same day, the prosecutor filed a new information. In addition to the gang enhancements, the prosecutor added count 5, a substantive gang allegation pursuant to section 186.22, subdivision (a).

The Honorable H. N. Papadakis was assigned as the new trial judge. During motions in limine on July 18, 2013, Judge Papadakis noted the issue of motive/intent was "a tremendous issue in this case," and he denied the motion to bifurcate the gang issues.

23.

## C. Legal Analysis

Section 1385 grants the trial court authority, on its own motion or on the motion of the prosecution, to order dismissal of an action in the furtherance of justice. The trial court has broad authority under this section, though it is not absolute. The language of the statute requires consideration of both the constitutional rights of the defendant and the interests of society presented by the People. The reason for dismissal must be that which would motivate a reasonable judge. (*People v. Orin* (1975) 13 Cal.3d 937, 945.) Dismissals may be proper before, during, and after trial. (*Id.* at p. 946.)

Before trial, such dismissals have been upheld where designated to enable the prosecution to obtain further witnesses, to add defendants, to plead new facts, or to plead new offenses. (*People* v. *Orin*, *supra*, 13 Cal.3d at p. 946.) Appellate courts have shown considerable opposition to the granting of dismissals under section 1385 in instances where the People are thereby prevented from prosecuting defendants for offenses where there is probable cause to believe they are guilty as charged. Society, represented by the People, has a legitimate interest in the fair prosecution of crimes properly alleged. A dismissal arbitrarily cutting off those rights without a showing of detriment to the defendant is an abuse of judicial discretion. (*Orin*, at pp. 946–947.)

Although defendants vigorously argue the prosecutor was forum shopping, depriving them of their right to due process, and otherwise manipulating judicial process, there is no evidence in the record to support these contentions. The prosecutor's stated reason for seeking a dismissal of the case in July 2013 was because despite due diligence, two witnesses—including Machado, the principal prosecution witness—had not been found and served with a subpoena to testify at trial. The prosecutor did not want to try the case with Machado's preliminary hearing testimony—a trial by transcript. Seeking to secure the primary witness not only secured the People's rights, but defendants' right to due process. Once Machado was available to testify, the jury had the ability to evaluate his credibility much more carefully than would have been possible with a cold, dry reading of his preliminary hearing testimony.

There is nothing in the record to challenge the prosecutor's veracity when he told the court Machado was unavailable to testify. Judge Saucedo found no ill motive by the prosecutor and had a valid, supportable reason in the interests of justice for granting the People's motion pursuant to section 1385. We agree with the People that *People v. Silva* (1965) 236 Cal.App.2d 453, 457, relied upon by defendants, is distinguishable from this case. There, the court found the prosecutor's dismissal of the action was a mere pretext, and the prosecutor had provided no legitimate reason to dismiss the case. (*Ibid.*) The prosecutor here demonstrated a legitimate basis for moving to dismiss the case.

Defendants further argue the prosecutor's conduct amounted to improper forum shopping. As a general rule, one trial judge should not overrule the order of another; in effect, becoming a one-judge appellate court. This rule discourages forum shopping, prevents one judge from interfering with an ongoing case before another judge, and prevents the second judge from ignoring or arbitrarily rejecting the order of the previous judge. Where there has been a reversal of a judgment on appeal and a remand for reconsideration of pretrial motions, or there has been a mistrial and the issues being tried remain in flux where the rulings are interlocutory, the outcome remains undetermined and one judge may overrule the order of another. (*People v. Riva* (2003) 112 Cal.App.4th 981, 991–992; see *People v. Mattson* (1990) 50 Cal.3d 826, 849.) Reconsideration must be made with due consideration, the revised ruling cannot be arbitrary, and it must be exercised in conformity with the defendant's right to due process of law. (*People v. Riva*, *supra*, at p. 992.)

Judge Saucedo's ruling was made during in limine motions prior to the commencement of trial. Judge Saucedo granted the bifurcation motion in early pretrial hearings. Judge Papadakis presided over the first trial, ending in mistrial, and the second trial. In pretrial hearings prior to the first trial, Judge Papadakis ruled differently than Judge Saucedo on the bifurcation motion. After Judge Saucedo's earlier ruling, however, the procedural circumstances remained in flux. After Judge Saucedo's ruling, the

25.

People's theory of motive had changed from one of tax collection by the gang to one of retaliation by the gang for Machado's disrespect toward defendants. A substantive gang allegation was added to the information. There was evidence to support the prosecutor's shift in theory. Under these circumstances, we cannot attribute improper motive to the prosecutor or categorize his conduct as forum shopping. Under *People v. Riva*, the new judge could rule differently from the first judge.

In conclusion, defendants have failed to demonstrate the prosecutor moved to dismiss the case for an improper reason, acted vindictively, or otherwise acted to undermine their right to due process. This ground for appeal is rejected.

## II.    Effect of Senate Bill 1437

### A.    Abbreviated Factual Summary

We briefly summarize the salient facts as they pertain to the question of the effects of Senate Bill 1437 to Medrano's and Martinez's convictions for attempted murder.

Machado lived in a mobilehome where he was growing medical marijuana. At around 11:00 p.m. on November 24, 2010, Machado was at home when he heard a truck outside. Shortly after, he heard multiple footsteps on his porch. Someone said "FBI" just before kicking in his door and entering. (Machado subsequently identified the defendants as those who entered his home.) Machado grabbed a shotgun and crouched down in his bedroom on the right side of a couch between his bed and a closet. Machado recognized Avellanoza standing in the doorway. Avellanoza pointed a pistol at Machado and fired. Machado fired back. Several bullets grazed his body and one penetrated Machado's shoulder. After the shots were fired, Machado could see Medrano and Martinez fleeing from the "marijuana grow room." Each was carrying a handgun. Additional gunfire was directed toward Machado through the wall of his bedroom by defendants as they exited his home.

The jury found all three defendants guilty of attempted murder, and true allegations that each used a firearm in its commission. However, the jury did not find

26.

true that Medrano and Martinez acted as principals or caused great bodily injury. On the other hand, the jury found true allegations Avellanoza personally used a firearm, acted as a principal and that he inflicted great bodily injury. In addition, Avellanoza was found guilty of shooting into an inhabited dwelling. Medrano and Martinez were acquitted of this charge.

Among other theories, the jury was instructed on the natural and probable consequences doctrine to support attempted murder liability against Medrano and Martinez.

## B.      Introduction

On September 30, 2018, while defendants' petition for review in this case was pending in the California Supreme Court, the Governor signed Senate Bill 1437, which became effective on January 1, 2019. Senate Bill 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) This was accomplished through amendments to sections 188 and 189. It also added section 1170.95, which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018, ch. 1015, §§ 2–4.)

As to the natural and probable consequences doctrine, at issue here, Senate Bill 1437 added a provision to section 188 concerning the mens rea for accomplice liability. "Now, to be convicted of murder, a principal must act with malice aforethought; malice can no longer 'be imputed to a person based solely on [his or her] participation in a crime.' (§ 188, subd. (a)(3).)" (*In re R.G.* (2019) 35 Cal.App.5th 141, 144.) These changes reflect the Legislature's intent that "[a] person's culpability for murder … be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch.

27.

1015, § 1, subd. (g); see *People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1147.)

### C. Contentions

Martinez and Medrano contend they are entitled to relief under Senate Bill 1437 because the prosecutor argued, and the court instructed the jury, that Martinez and Medrano could be convicted of attempted murder based on the now invalidated natural and probable consequences theory. Specifically, Martinez argues he "is entitled to some form of relief on appeal from the attempted-murder conviction because amendment of section 188 now forbids imputed malice which benefits [Martinez] and his conviction is not yet final." He asserts "[e]ither the petition process [provided for in section 1170.95] must be interpreted as applying to crimes other than murder, i.e., to the lesser included offense of attempted murder, or the petition process does not operate as [an] implied savings clause for attempted-murder convictions and, thus, does not preclude retroactive application of the ameliorative amendment of version [*sic*] of section 188 to cases not yet final." He contends "[r]eversal of the conviction on appeal would afford the prosecution the option of retrial on the issue of malice because reversal will not be upon grounds of insufficient evidence."

Similarly, Medrano argues Senate Bill 1437's amendment to section 188, subdivision (a)(3) "repeals the natural and probable consequences theory of murder liability" and "allows murder liability based only upon the individual defendant's mens rea." Accordingly, "murder can no longer be based only on the putative natural and probable consequences of the lesser crime in which the aider participated." He notes, though "there is no reference to attempted murder in the revisions of sections 188 and 189, or in new section 1170.95," the legislation should apply to attempted murders "in view of the legislative intent of the new statute, as well as principles applicable to attempted murder."

28.

Medrano further contends he is entitled to relief on direct appeal, and is not limited to the petitioning procedure provided for in section 1170.95.  He asserts section 1170.95 was meant "to *extend* an opportunity for retroactive relief to … inmates whose convictions have already become final" and was not meant to limit an appellant's ability to seek relief on direct appeal.  He argues *People v. Martinez*, *supra*, 31 Cal.App.5th 719 and *People v. Anthony, supra,* 32 Cal.App.5th 1102—in which our sister courts held relief must be sought through a section 1170.95 petition at the trial court level—were wrongly decided, and those courts erred in relying on the California Supreme Court's reasoning in *People v. Conley* (2016) 63 Cal.4th 646 and *People v. DeHoyos* (2018) 4 Cal.5th 594.  He argues the *Conley* and *DeHoyos* courts held defendants seeking relief under Propositions 36 and 47 had to follow the petitioning procedures provided in the related statutes because relief was conditioned on the trial court's finding the defendant would not "pose an unreasonable risk of danger to public safety."  (Italics omitted.) Medrano contends these cases are inapposite because section 1170.95 does not "impose any … substantive requirement for retroactive relief" subject to a trial court's discretionary evaluation.  He further contends section 1170.95 does not say a defendant "must" file a superior court petition to seek relief, but rather that a defendant "'may file a petition with the [superior court].'"  He argues limiting the availability of relief to the petitioning procedure would render meaningless section 1170.95, subdivision (f), which states, "This section does not diminish or abrogate any rights or remedies otherwise available to the petitioner."  Finally, he asserts requiring defendants with nonfinal judgments to resolve their claims under Senate Bill 1437 before the trial court abridges their Sixth Amendment right to a jury trial.  He asserts "[i]f he is relegated to his remedy pursuant to section 1170.95, he will never have a jury decide whether [he] intended to kill Machado.  The prosecution will be able to present new evidence on malice, and the judge, not a jury, will sit as the trier of fact."

The People respond that Medrano and Martinez must petition the trial court for resentencing based on the Legislature's enactment of section 1170.95. They contend "[p]ermitting [a defendant] to obtain relief on direct appeal would undermine this process, treat final judgments differently from nonfinal ones despite no legislative intent to do so, deprive the prosecution of its right to present additional evidence, and deny the trial court of 'its province' to 'decide questions of fact.'" However, the People also argue Medrano and Martinez are not entitled to relief under Senate Bill 1437 or to utilize the petitioning procedure provided for in section 1170.95 because the new legislation and procedure for relief only apply to defendants convicted of murder under a natural and probable consequences theory or felony murder, not attempted premeditated murder. In support, the People rely on the plain language of the amended statutes and cases holding legislation regarding sentencing enhancements do not apply to attempts given that attempts are not listed among the covered offenses. (See, e.g., *People v. Epperson* (2017) 7 Cal.App.5th 385; *People v. Reed* (2005) 129 Cal.App.4th 1281; *People v. White* (1987) 188 Cal.App.3d 1128; *People v. Le* (1984) 154 Cal.App.3d 1.) They contend "[b]ecause the text of the statute is clear, there is no need for judicial interpretation, and the inquiry is at an end." Finally, they argue excluding attempted premeditated murder from the scope of Senate Bill 1437's changes does not violate the equal protection clause.

### D. Applicability of Senate Bill 1437 to Attempted Murder

The applicability of Senate Bill 1437 to the crime of attempted murder presents an issue of statutory interpretation for our independent review. (See *People v. Tran* (2015) 61 Cal.4th 1160, 1166 ["We review de novo questions of statutory construction"]; *In re R.G.*, *supra*, 35 Cal.App.5th at p. 146.) Prior to Senate Bill 1437's enactment, a person who knowingly aided and abetted a crime, the natural and probable consequences of which was attempted murder or murder, could be convicted of not only the target crime but also of the resulting attempted murder or murder, but not first degree murder. (*People v. Chiu* (2014) 59 Cal.4th 155, 161, 166; *In re R.G.*, *supra*, at p. 144.)

30.

"'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense.'" (*People v. Chiu, supra,* 59 Cal.4th at p. 164.) The *Chiu* court further explained:

> "[S]ection 31 provides in relevant part that '[a]ll persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission … are principals in any crime so committed.' It does not expressly mention the natural and probable consequences doctrine. Where the statutory language is vague, 'the statutory definition permits, even requires, judicial interpretation.' (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) We may, as a court, determine the extent of aiding and abetting liability for a particular offense, keeping in mind the rational function that the doctrine is designed to serve and with the goal of avoiding any unfairness which might redound from too broad an application. [Citations.]" (*Ibid.*)

Excepting the felony-murder rule,[4] an accomplice may be convicted of a crime under one of two alternative theories: direct aiding and abetting liability and the natural and probable consequences doctrine. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator." (*Id*. at p. 1118.) It follows that if malice is an element of a charged offense, accomplice liability under the natural and probable consequences doctrine necessarily entails the imputation of malice. (See *McCoy*, at pp. 1117–1118; *People v. Lee* (2003) 31 Cal.4th 613, 623–624; see also *People v. Prettyman* (1996) 14 Cal.4th 248, 259 ["'We euphemistically may impute the

---

[4]Senate Bill 1437's changes to section 189 are not at issue because "California has no crime of attempted felony murder." (*People v. Billa* (2003) 31 Cal.4th 1064, 1071, fn. 4, citing *People v. Bland* (2002) 28 Cal.4th 313, 328; accord, *People v. Brito* (1991) 232 Cal.App.3d 316, 321 ["California courts have consistently held that there are no crimes of attempted felony murder [or] attempted murder based on implied malice"].)

actions of the perpetrator to the accomplice by "agency" doctrine; in reality, we demand that she who chooses to aid in a crime forfeits her right to be treated as an individual'"].) However, as amended by Senate Bill 1437, section 188 plainly states: "*Malice shall not be imputed to a person based solely on his or her participation in a crime*." (*Id*., subd. (a)(3), italics added.)

Pursuant to the above reasoning, we conclude Senate Bill 1437 precludes any imposition of vicarious liability under the natural and probable consequences doctrine if the charged offense requires malice aforethought. Because malice cannot be imputed to a defendant who aids and abets a target offense without the intent to kill, the natural and probable consequences doctrine is no longer a viable theory of accomplice liability for attempted murder. Put differently, since "implied malice cannot support a conviction of an *attempt* to commit murder" (*People v. Bland*, *supra*, 28 Cal.4th at p. 327; see fn. 4, *ante*), the current version of section 188 requires proof the aider and abettor acted with the intent to kill while aiding and abetting the target offense.

We acknowledge two of our sister courts have held Senate Bill 1437 does not affect the natural and probable consequences doctrine as it relates to attempted murder. (*People v. Lopez, supra,* 38 Cal.App.5th at pp. 1102–1113, rev. granted; *Munoz*, *supra*, 39 Cal.App.5th at pp. 753–769, rev. granted.) However, we respectfully disagree with their analyses and conclusions for the following reasons.

"The '"goal of statutory construction is to ascertain and effectuate the intent of the Legislature."' [Citation.] In approaching this task, we must first look at the plain and commonsense meaning of the statute because it is generally the most reliable indicator of legislative intent and purpose. [Citation.] If there is no ambiguity or uncertainty in the language, the Legislature is presumed to have meant what it said, and we need not resort to legislative history to determine the statute's true meaning." (*People v. Cochran* (2002) 28 Cal.4th 396, 400–401.) In other words, the plain meaning controls unless the words are ambiguous. (*People v. Costella* (2017) 11 Cal.App.5th 1, 6.) "'If the statute is

32.

ambiguous, we may consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy.'" (*Ibid.*) We may "'examin[e] the context in which the language appears and adopt[] the construction which best serves to harmonize the statute internally and with related statutes.'" (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1126.)

The *Lopez* opinion acknowledges that "Senate Bill 1437 eliminates aider and abettor liability for murder under the natural and probable consequences doctrine" (*People v. Lopez, supra*, 38 Cal.App.5th at p. 1092, rev. granted), but it suggests the imposition of vicarious liability for attempted murder under the same doctrine is not based on imputed malice. (*Id.* at p. 1106.) The logic of this argument escapes us.[5] We are also unpersuaded by *Lopez*'s reliance on the absence of any reference to "attempted murder" in Senate Bill 1437. (*Lopez*, at pp. 1103–1105.) The omission is meaningless when one considers that sections 187, 188, and 189 have never included that term. Yet we look to these statutes in conjunction with section 21a, which explains the law of attempt, to define attempted murder.

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) Murder is defined as "[t]he unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Express malice is synonymous with the intent to kill. (§ 188, subd. (a)(1); *People v. Gonzalez* (2012) 54 Cal.4th 643, 653; *People v. Moon* (2005) 37 Cal.4th 1, 29.) A criminal attempt "bears an extremely close relationship to the completed crime. Attempts, after all, are defined as incomplete efforts to commit a completed crime." (*People v. Fontenot* (2019) 8 Cal.5th 57, 64.) Attempted murder thus requires "the specific intent to kill and the commission of a direct but ineffectual act

---

[5]"'The word "impute" … means to bring into the reckoning, to attribute or to ascribe. It is sometimes used to attribute vicariously,—to ascribe as derived from another.'" (Black's Law Dict. (11th ed. 2019) p. 908, quoting Perkins & Boyce, Criminal Law (3d ed. 1982) p. 605.)

toward accomplishing the intended killing." (*People v. Booker* (2011) 51 Cal.4th 141, 177–178.)

The Legislature is presumed to be aware of existing interpretations of statutory language when it amends a statute. (*Dix v. Superior Court* (1991) 53 Cal.3d 442, 461–462.) When the Legislature amended section 188 to state "[m]alice shall not be imputed to a person based solely on his or her participation in a crime" (*id.*, subd. (a)(3)), it made no exceptions for attempted murder, which indisputably requires express malice. (*People v. Booker*, *supra*, 51 Cal.4th at p. 178.) By failing to exclude attempted murder from the ambit of section 188, the Legislature must have intended for its provisions to apply to all crimes requiring express malice. We thus find the *Lopez* court's reasoning to be untenable. (See *People v. Lopez*, *supra*, 38 Cal.App.5th at p. 1104, rev. granted ["Had the Legislature meant to bar convictions for attempted murder under the natural and probable consequences doctrine, it could easily have done so"].)

The legislative intent to restrict the imputation of malice in prosecutions for both murder and attempted murder is demonstrated by the precise language used to amend section 188. Had the Legislature intended to confine its repudiation of the natural and probable consequences doctrine to murder, it could easily have said: "*Except for attempted murder*, malice shall not be imputed to a person based solely on his or her participation in a crime." (Italics added.) The same preposition, "except," appears in the preceding sentence to exclude felony-murder prosecutions from the scope of the provision. (§ 188, subd. (a)(3); cf. *Munoz*, *supra*, 39 Cal.App.5th at p. 757, rev. granted [""""When the Legislature 'has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded.'" [Citation.]'"].) Because the crime of attempted murder is tethered to the murder statutes, i.e., it does not exist without them, there is no logical basis for applying section 188 to murder and treating the crime of attempted murder as being subject to an impliedly different and unspecified rule of law. Neither *Lopez* nor *Munoz* persuades us to conclude otherwise.

34.

The foregoing analysis is buttressed by the California Supreme Court's recent observation that "courts impose a 'heightened intent requirement' for attempts … even when the completed crime requires a less demanding mental state" in order "[t]o ensure that only those whose intentions and actions made them a pronounced threat to accomplish what a given criminal statute prohibits may be found criminally liable." (*People v. Fontenot*, *supra*, 8 Cal.5th at p. 67.) "In effect, the higher bar serves as a bulwark against convicting someone of attempting to accomplish something he or she never set out to do." (*Id.* at pp. 67–68.) The Legislature codified this safeguard in section 21a by making "'*specific intent* to commit the [completed] crime'" a required element of attempt crimes. (*Fontenot*, at p. 68.)

For all these reasons, Senate Bill 1437's abrogation of the natural and probable consequences doctrine as stated in section 188, subdivision (a)(3) necessarily applies to attempted murder. To hold otherwise would ignore the plain language of the statute and conflict with the underlying policy of the legislation. As noted by our state Supreme Court, "where the natural-and-probable-consequences doctrine does apply, an attempted murderer who is guilty as an aider and abettor may be less blameworthy [than the principal offender]." (*People v. Lee, supra*, 31 Cal.4th at p. 624.) Our interpretation of Senate Bill 1437 comports with its stated goal of ensuring a defendant's culpability is premised upon his or her own actions and subjective mens rea. (Stats. 2018, ch. 1015, § 1, subds. (d), (g).)

### E.    Martinez and Medrano Are Ineligible for Relief Under Section 1170.95

Here, the parties note Senate Bill 1437 enacted section 1170.95, which permits defendants "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition" (*id.*, subd. (a)) to seek relief under the new legislation. It does not expressly provide for relief to defendants, like Martinez and Medrano, who may have been convicted of *attempted murder* under a natural and probable consequences theory. The People argue, accordingly, the plain language of

35.

section 1170.95 renders Martinez and Medrano categorically ineligible for relief. Martinez and Medrano argue the changes effectuated by Senate Bill 1437 coupled with the Legislature's stated intent reflects the statutory amendments should apply to defendants like them who were convicted of attempted premeditated murder based on a natural and probable consequences theory of liability. Based on the plain language of section 1170.95, we agree Martinez and Medrano may not seek relief through its designated petition procedure.

Newly enacted section 1170.95 permits those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts …." (*Id.*, subd. (a).) An offender may file a petition under section 1170.95 where all three of the following conditions are met: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[; and] [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)–(3).)

A trial court receiving a petition under section 1170.95 "shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section." (*Id.*, subd. (c).) If the petitioner has made such a showing, the trial court "shall issue an order to show cause." (*Ibid.*) The trial court must then hold a hearing "to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as

36.

if the petitioner had not been previously been [*sic*] sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (*Id.*, subd. (d)(1).)

The plain language of section 1170.95, subdivision (a) limits relief to persons "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court …." No language in section 1170.95 references relief to persons convicted of attempted murder. And, as noted in *People v. Lopez*, the legislative history of Senate Bill 1437 supports the conclusion section 1170.95 was intended to apply only to persons convicted of murder:

> "There may well be sound policy reasons for the Legislature to adopt ameliorative provisions like those in Senate Bill 1437 for individuals charged with, or convicted of, attempted murder under the natural and probable consequences doctrine. But the Legislature's decision to limit sentencing reform at this time to offenders in cases of murder is certainly rational. First, the gap between a defendant's culpability in aiding and abetting the target offense and the culpability ordinarily required to convict on the nontarget offense is greater in cases where the nontarget offense is murder, than where the nontarget offense is attempted murder or, in the prosecutor's discretion, aggravated assault. The Legislature could have reasonably concluded reform in murder cases 'was more crucial or imperative.' …

> "Second, the process created in section 1170.95 for those convicted of felony murder or murder under a natural and probable consequences theory to petition the sentencing court to vacate that conviction and to be resentenced is not cost free. The staff of the Senate Appropriations Committee estimated, if 10 percent of the inmates eligible for relief under Senate Bill 1437 petitioned the courts for resentencing, additional court workload costs would approximate $7.6 million. The committee's report expressed concern that this increase in workload 'could result in delayed court services and would put pressure on the General Fund to fund additional staff and resources.' (Sen. Com. Appropriations Report, p. 3.) Additional expenditures would also be required to transport petitioners in custody to and from court hearings. (*Ibid.*)

> "In a world of limited resources, it is reasonable for the Legislature to limit the scope of reform measures to maintain the state's financial integrity. [Citations.]" (*People v. Lopez*, *supra*, 38 Cal.App.5th at pp. 1111–1112, fn. omitted, rev. granted; see *Munoz*, *supra*, 39 Cal.App.5th at pp. 753–760, rev. granted.)

37.

We agree with the reasoning of *Lopez* and *Munoz* that the relief provided in section 1170.95 is limited to certain murder convictions and excludes all other convictions, including a conviction for attempted murder. The language and the legislative history of section 1170.95 support this conclusion. And there is a rational basis for the Legislature's decision to grant relief pursuant to section 1170.95 only to murder convictions and exclude attempted murder convictions based on judicial economy and the financial costs associated with reopening both final murder and final attempted murder convictions. In light of this unambiguous language, Martinez and Medrano are categorically excluded from seeking relief through the section 1170.95 petitioning procedure for their attempted murder convictions.

**F.      The Amendatory Statutes Apply Retroactively on Direct Appeal to Nonfinal Attempted Murder Convictions Under *Estrada***

Though Martinez and Medrano may not obtain relief at the trial court level pursuant to section 1170.95's petition procedure, they are not barred from all relief. Rather, we conclude the *Estrada* rule (*In re Estrada*, *supra*, 63 Cal.2d 740) requires us to consider their claim on direct appeal, given that Senate Bill 1437 resulted in an ameliorative change to the criminal law applicable to their convictions.

Section 3 provides that "[n]o part of [the Penal Code] is retroactive, unless expressly so declared." However, "new laws that reduce the punishment for a crime are presumptively to be applied to defendants whose judgments are not yet final." (*People v. Conley*, *supra*, 63 Cal.4th at p. 656, citing *In re Estrada*, *supra*, 63 Cal.2d 740.) Accordingly, if an "amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final then … it, and not the old statute in effect when the prohibited act was committed, applies." (*In re Estrada*, *supra*, at p. 744.) "The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that

38.

are final and sentences that are not.'" (*People v. Buycks* (2018) 5 Cal.5th 857, 881–882, quoting *Conley*, *supra*, at p. 657.) "'The rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses.'" (*People v. Buycks*, *supra*, at p. 882, quoting *People v. Nasalga* (1996) 12 Cal.4th 784, 792.)

Here, there is no clear indication in Senate Bill 1437 or the resulting statutory amendments that the Legislature only intended to provide prospective relief for the ameliorative changes to the law such that a defendant's nonfinal attempted murder conviction would be exempt from relief on appeal. While section 1170.95 expands the scope of relief to defendants convicted of felony murder or murder under the natural and probable consequences theory to those whose judgments are final, it in no way limits retroactive relief to defendants convicted of attempted murder under the natural and probable consequences theory whose convictions are not final. Accordingly, because Martinez's and Medrano's judgments of conviction were not yet final when these amendatory statutes lessening punishment took effect, the amended statutes, not the old statutes in effect when the prohibited acts were committed, apply. (See *In re Estrada*, *supra*, 63 Cal.2d at p. 744.)

G.     **Defendants Were Prejudiced by the Instruction on the Invalid Theory**

Finally, we conclude the court's instruction on the now invalidated natural and probable consequences theory as it relates to attempted murder was not harmless beyond a reasonable doubt. Thus, Medrano's and Martinez's attempted murder convictions must be reversed.

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 167; see *In re Martinez* (2017) 3 Cal.5th 1216, 1226 [an instruction on an invalid legal theory may be harmless when "'other aspects of the verdict or the evidence

39.

leave no reasonable doubt that the jury made findings necessary'" to find the defendant guilty under an alternative, valid legal theory].)  Thus, "we apply the *Chapman* standard [citation] to evaluate an instruction that improperly defines an element of a charged offense."  (*People v. Stutelberg* (2018) 29 Cal.App.5th 314, 319; *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)  Under *Chapman*, an instructional error must result in reversal unless it appears beyond a reasonable doubt that the error did not contribute to the verdict.  (*People v. Aledamat* (2019) 8 Cal.5th 1, 12–13.)

Here, it is undisputed the court instructed the jury on the now invalidated natural and probable consequences theory as a basis for convicting Martinez and Medrano of attempted murder.  Indeed, pursuant to CALCRIM No. 417, the court instructed the jury it could convict Martinez and Medrano of attempted murder if it concluded defendants conspired to commit assault with a deadly weapon, a member of the conspiracy committed attempted murder, and attempted murder was a natural and probable consequence of the common plan or design of the crime that defendants conspired to commit.  The court further instructed the jury defendants could be convicted either as a direct perpetrator, an aider and abettor, or, "[u]nder some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."  (CALCRIM No. 400.)

Additionally, during closing argument, the prosecutor asked the jury:  "How can we hold all three of these defendants accountable … for … attempted murder when … Avellanoza is the one who went in the room and actually shot and hit the guy[?]"  He asserted:

> "There's three theories of liability and it doesn't matter which way you go but either way you're gonna end up with a guilty verdict.  There is direct liability.  Basically if an individual goes and commits a crime, they're liable for the crime.  That's nothing new.

> "There's also aiding and abetting so if you assist someone in going and committing a crime, you're also on the hook and you're liable.

40.

"And then there's liability for coconspirator acts and I know all of you are thinking … [w]e never heard anything about conspiracy. There's no conspiracy charge and it's somewhat confusing but conspiracy is not only a charge that can be filed but it is also a theory of liability on which the defendants can be held responsible on any of the counts filed and the judge will provide you with instructions on that."

The prosecutor explained: "[I]f the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." He argued that Avellanoza went into Machado's house knowing he was "going to shoot somebody"; Martinez and Medrano were "aiding and abetting in a lot of this"; and all three defendants went into the house with guns and "intended to commit an assault with a deadly weapon." He explained: "[I]f you're a member of a conspiracy, you're criminally responsible for any act that any other member does as long as it's natural and probable. This is why we talked about how there's at least a conspiracy to commit an assault with a deadly weapon." He argued, attempted murder is a natural and probable consequence of shooting a gun at somebody—"that would be an intent to kill them."

Thus, there is no question the jury was presented with the now invalid natural and probable consequences theory as a basis for holding Martinez and Medrano liable for attempted murder. And we find no basis in the record to conclude beyond a reasonable doubt that the jury did not rely upon this now invalid theory to convict Martinez and Medrano of attempted murder or that it made the findings necessary to convict the defendants under an alternative, valid legal theory. (*People v. Aledamat, supra,* 8 Cal.5th at pp. 12–13.) Accordingly, we must reverse Martinez's and Medrano's convictions for attempted murder.[6] The People, however, may choose to retry those charges under any other currently valid theory for liability. (See *People v. Chiu*, *supra*, 59 Cal.4th at p. 168 [where jury may have focused on invalidated natural and probable consequence theory to

---

[6]In light of our reversal of the attempted murder convictions, Medrano's and Martinez's contentions that reversal of the premeditation and deliberation findings on the attempted murder convictions is required under *People v. Chiu*, *supra*, 59 Cal.4th 155 are rendered moot.

41.

convict defendant of first degree murder, reversal was required because "there was no basis in the record to conclude that the verdict was based on the legally valid theory that defendant directly aided and abetted the murder"]; *People v. Rivera* (2015) 234 Cal.App.4th 1350, 1358–1359 [first degree premeditated murder conviction reversed in light of *Chiu* where it may have been based on the natural and probable consequences theory, permitting defendant to accept reduction to lesser offense or prosecutor to retry greater offense]; see also *In re Martinez, supra*, 3 Cal.5th at pp. 1224, 1226 [once defendant has shown jury was instructed on correct and incorrect theories of liability, the presumption is the error affected the judgment and "the record does not permit us to rule out a reasonable possibility that the jury relied on the invalid natural and probable consequences theory in convicting [the defendant] of first degree murder"].)

### III.    Substantial Evidence of Identity and Premeditation[*]

#### A.    Contentions

Medrano and Martinez challenge the sufficiency of the evidence to show they were the perpetrators of the shooting, and they contend there is insufficient evidence of premeditation to kill Machado.[7]  Defendants also challenge the sufficiency of the

---

[*]See footnote, *ante*, page 1.

[7]Citing to *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363–364, the People characterized Avellanoza's incorporation by reference of several of the arguments set forth in his codefendants' briefs as a wholesale and improper application of California Rules of Court, rule 8.200(a)(5) (rule 8.200(a)(5)).  Rule 8.200(a)(5) states:  "Instead of filing a brief, or as part of its brief, a party may join in or adopt by reference all or part of a brief in the same or a related appeal."  The practice condemned in *Bryant* occurred in the context of a multiple defendant capital appeal in which there were many briefs, several hundred pages long, with many issues in which a defendant simply adopted the other defendants' briefs wholesale without pointing out distinctions in the facts and issues applying to that particular defendant.  The *Bryant* court disapproved of wholesale incorporation of other defendants' issues as an improper tactic because many of the issues raised did not apply to all of the defendants.  (*Bryant, supra*, at pp. 363–364.)

Some of the issues raised in defendants' briefs either applied to, or arguably applied to, all three defendants.  In his reply brief, appellate counsel for Avellanoza stated he specifically did not join his codefendants' arguments concerning sufficiency of the evidence of perpetrator identity, premeditation, Martinez's motion to sever during trial, the codefendants' conspiracy argument, or the argument concerning the unanimity instruction.  Avellanoza's appellate counsel

evidence for the substantive gang offense and gang enhancements. Sufficiency of the gang evidence will be addressed separately, *post*. The People reply substantial evidence shows defendants were the perpetrators of the shooting.

## B. Standard of Review

When a defendant challenges the sufficiency of the evidence, appellate courts must review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. This standard of appellate review is the same in cases in which the People primarily rely on circumstantial evidence. Although a jury must acquit if it finds the evidence susceptible of a reasonable interpretation favoring innocence, it is the jury, not the reviewing court, that weighs the evidence, resolves conflicting inferences, and determines whether the People have met the burden of establishing guilt beyond a reasonable doubt. If the trier of fact's findings are reasonably justified under the circumstances, the opinion of the reviewing court that the circumstances may also be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Casares* (2016) 62 Cal.4th 808, 823–824.) After reviewing the evidence in the light most favorable to the prosecution, we determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212–1213.)

"[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see Evid. Code, § 411.) An appellate court must accept logical inferences the jury might have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Before setting aside the judgment of the trial court

made his incorporation by reference out of an abundance of caution and there are overlapping issues properly joined under rule 8.200(a)(5). We do not find an abuse of rule 8.200(a)(5) similar to that found in *Bryant*.

for insufficiency of the evidence, it must clearly appear there was no hypothesis whatever upon which there was substantial evidence to support the verdict. (*People v. Conners* (2008) 168 Cal.App.4th 443, 453; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

### C.    Identity Evidence

Medrano and Martinez assert Machado's testimony identifying them is insufficient. Specifically, they challenge Machado's testimony as being physically impossible and inherently improbable. They note the incident lasted only seconds, the closet protruded into the room thereby blocking Machado's view out of the bedroom door, and Machado acknowledged he only got a glimpse of the two intruders other than Avellanoza.

On the other hand, the People note Machado had encounters with Medrano and Martinez prior to the incident, and on two of these occasions—at a party and at a convenience store—Medrano and Martinez were together. Machado had been in altercations with Medrano and Martinez. Machado had known Martinez for 20 years, lived in the same neighborhood, and Martinez was a grade ahead of Machado in school. This made it possible for Machado to recognize Martinez's voice toward the end of the shooting.

Machado identified Medrano and Martinez as the two assailants who ran from the grow room to a room adjacent to his bedroom. Machado also saw the two men behind Avellanoza as Avellanoza stood in the doorway after kicking down the door. Although Machado admitted his view was "thin," he still had a "clear view" of Medrano and Martinez. Machado recognized them "quite clearly." Machado identified Medrano and Martinez to investigators.

We also agree with the People that although Machado made differing statements concerning his exact position in the room during the course of the shooting, his identifications of Medrano and Martinez were not impossible or inherently improbable.

44.

Martinez characterized the closet as protruding into the bedroom so as to block Machado's view into other rooms. We agree with the People, however, that the photographs admitted as exhibits 9, 12, and 14 show the closet was inset from the room, with the point of entry into the closet flush with the wall and bedroom door.

Machado explained that during the shooting he did not remain stationary. He was generally positioned between the closet and the bed. Detective Meek testified at first he was unable to see the grow room from the position Machado described. Meek further explained that from a point between the end of the mattress and the first opening of the closet, through a small open space, he could see into the grow room by peeking around "a little bit."

The jury could have reasonably concluded Machado was in a position, however brief, to look out the bedroom door and see Medrano and Martinez. The jury clearly found Machado's statements credible, and a reviewing court must defer to the jury's assessment of the facts even where there are inconsistencies in an account and even where the evidence can be reconciled with a contrary finding. A reviewing court presumes in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263.) There was sufficient, credible evidence to support the victim's identification of Medrano and Martinez as participants with Avellanoza in the shooting.

### D.     Evidence of Premeditation

According to Medrano and Martinez, there was insufficient evidence to establish premeditation because the record is devoid of a credible explanation for the shooting and there was no evidence of planning, motive, or mode of killing indicative of a preconceived plan. We strongly disagree.

In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*), the California Supreme Court surveyed precedent and developed guidelines to aid reviewing courts in assessing sufficiency of the evidence to sustain findings of premeditation and

45.

deliberation. The court in *Anderson* identified three categories of evidence pertinent to the analysis: planning, motive, and manner of killing. *Anderson* stated first degree murder verdicts are typically sustained when there is evidence of all three categories. Otherwise, *Anderson* requires at least extremely strong evidence of planning or evidence of motive in conjunction with evidence of either planning or manner of killing. The *Anderson* guidelines are descriptive, not normative, and in developing the guidelines the court was not redefining the requirements for proving premeditation and deliberation. The categories of evidence are not an exhaustive list of evidence that could sustain a finding of premeditation and deliberation. (*People v. Young*, *supra*, 34 Cal.4th at pp. 1182–1183; *People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

The same *Anderson* evaluation applies in the context of premeditated attempted murder. (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1624, 1626–1627.) The process of premeditation does not require any extended period of time. The test is not the duration of time but the extent of reflection. Thoughts may follow one another with great rapidity and cold, calculated judgment may be quickly achieved. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080; *People v. Mayfield* (1997) 14 Cal.4th 668, 767, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2; *People v. Felix*, *supra*, at p. 1626.) The fundamental inquiry is whether a rational jury could have concluded the crime occurred as the result of preexisting reflection rather than a rash or unconsidered impulse. (*People v. Sanchez* (1995) 12 Cal.4th 1, 33, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Felix*, *supra*, at p. 1626.)

We share the People's assessment there was evidence of all three *Anderson* factors showing premeditation. Evidence of planning was demonstrated when Machado saw a suspicious truck lingering outside his home a short time before the attack. All three defendants wore black attire and hats to camouflage themselves at night. All three defendants were armed with guns. Someone yelled "FBI" prior to kicking in the front

door of Machado's home. As Avellanoza kicked in Machado's bedroom door and began to shoot at him, Medrano and Martinez shot into his room in a manner that appeared to be coordinated with Avellanoza. None of Machado's marijuana plants were stolen, suggesting the assailants intended to kill him. Martinez yelled they should go back and finish the job, also suggesting a previous plan to kill Machado. There was a fourth shooter outside Machado's residence who began to shoot at Machado as he crawled out his bedroom window. The evidence of planning was very strong.

Evidence of motive was shown by Machado's testimony that all three defendants had past altercations with him. Machado caught Avellanoza stripping a neighbor's car and detained Avellanoza at gunpoint until law enforcement arrived. Machado had multiple prior incidents with Medrano and Martinez, including one in which Machado was beaten by them or their compatriots at a convenience store. Even without a gang motive, there was undeniable animosity between Machado and all three defendants.

The manner of the shooting further supports a finding of premeditation and deliberation. One defendant employed deception when he yelled "FBI" before the door of the home was kicked in. The door to the grow room was kicked in just before the door to Machado's bedroom was kicked in, suggesting defendants were methodically searching for him. Avellanoza fired multiple shots at Machado from nearly point-blank range. Medrano and Martinez were simultaneously shooting at Machado through the bedroom wall from the adjoining room. Martinez later yelled at someone to "'[g]o back in and get him.'" The manner of the shooting was designed with the apparent premeditated intent to kill Machado.

There was evidence of all three factors announced in *Anderson* to determine if there was sufficient evidence of premeditation and deliberation. No defendant acted rashly or spontaneously during the shooting. Defendants' actions were careful and deliberate, and a rational jury had abundant evidence from which it could reasonably conclude the shooting of Machado was with premeditation and the intent to kill him.

47.

## IV.    Unanimity Instruction[*]

Medrano contends the trial court violated his state and federal right to due process when it failed to give the jury the unanimity instruction. Defendant argues Machado described three separate occasions in which he was fired upon: (1) Avellanoza kicking down his door and shooting; (2) Medrano and Martinez leaving the grow room, Avellanoza leaving the bedroom, and shooters began firing from outside the bedroom into the bedroom closet; and (3) someone outside by a tree shooting at Machado after he exited his bedroom. Because we reverse Medrano's attempted murder conviction on other grounds, we conclude this contention is now moot.

## V.    Detective's Opinion on Machado's Veracity[*]

Medrano and Avellanoza, joined by Martinez, argue Detective Hembree improperly vouched for Machado's veracity. Avellanoza further asserts prosecutorial misconduct for eliciting Hembree's testimony.

### A.    Detective Hembree's Testimony

When Hembree was asked how sure Machado was about his identification of Avellanoza, Hembree said Machado said he was confident of his identification, "'As sure as the sun will come up tomorrow.'" The prosecutor asked Hembree if he thought Machado was holding anything back from him. The trial court sustained an objection to this question by Medrano's attorney on foundation grounds. The prosecutor asked Hembree about Machado's demeanor. Hembree replied Machado answered Hembree's questions right away and volunteered more information than Hembree sought. Machado sometimes said things that "made himself look bad or … incriminate[d] himself."

The court sustained objections by Medrano's attorney concerning whether Machado was trying to shift blame or whether Machado appeared to be withholding information. When asked how Machado "was" in answering questions, Hembree replied,

---

[*]See footnote, *ante*, page 1.

[*]See footnote, *ante*, page 1.

"He was truthful to the—like you said, he was truthful to the point of almost being self-incriminating." The court overruled objections to this response by Avellanoza's attorney on the grounds the answer was speculative and lacked foundation.

Hembree further explained Machado's demeanor as follows:

"When a serious violent event occurs to [victims] or they're a victim of anything period, they tend to exaggerate or leave out their own indiscretions throughout time and many if, if you'll excuse the term, church it up. They try to make themselves in a better light.

"Mr. Machado was honest on how he knew these people and the problems he's had in the past and was able to say you know I'm—at these times you know we fought or we got into it and you know we've been having these problems since elementary school throughout time although in this incident these people tried to kill me."

Medrano's attorney objected to this testimony as being vague with regard to which defendants Hembree was referring to. The trial court overruled the objection. On cross-examination, Medrano's attorney asked Hembree if it was his opinion Machado had been truthful to him. Hembree replied, "Yes." When asked if he had ever been wrong about someone being truthful in the past, Hembree replied, "Absolutely."

Avellanoza's attorney asked Hembree on cross-examination how he measured truthfulness. Hembree explained it was based on a totality of the circumstances, including the witness's story versus the evidence and a comparison of what a witness says the first time and what he or she says the second time. Hembree acknowledged there was a discrepancy between his questioning of Machado and Detective Shaw's questioning because Machado could describe the fourth shooter to Shaw but had not been able to describe him to Hembree. Hembree said what Machado told him at the scene matched evidence presented at trial.

Hembree denied Machado's story was taken at face value. Hembree acknowledged he did not conduct his own investigation "again to determine … the lighting of the room and, and [Machado's] vantage point … to see if he could actually see the two people in the grow room." Hembree stated Machado's "story did not change and

49.

it was solid." Hembree stated if he does not see an inconsistency in a witness's story, he does not try to go back and prove it wrong.

## B. Analysis

A lay witness's opinion concerning another person's veracity is both inadmissible and irrelevant on the question of a statement's credibility. Such layperson testimony invades the province of the jury as the ultimate fact finder and does not bear on any other matters affecting credibility in Evidence Code section 780. A witness can be asked, however, about another person's demeanor, motives, background, as well as consistent and inconsistent statements on other occasions, and whether the statement had the "essential 'ring of truth.'" (*People v. Melton* (1988) 44 Cal.3d 713, 743–745.)

Hembree did testify Machado was truthful to the point of being self-incriminating. Taking this single comment out of context, Hembree would appear to have improperly testified concerning Machado's credibility. Viewed in its entirety, however, the tenor of Hembree's testimony did not improperly vouch for Machado's truthfulness. The prosecutor did not directly ask Hembree if Machado was truthful. The prosecutor asked Hembree what *Machado* said concerning how sure he was of his identification of Avellanoza. The prosecutor asked Hembree about Machado's demeanor when Machado answered questions. Hembree described a witness who: did not hesitate to answer questions, did not withhold information, volunteered information, did not exaggerate statements, did not try to cast himself in a favorable light or "church it up," and told a solid and consistent story that was concordant with the physical evidence.

On cross-examination, Hembree acknowledged he "absolutely" had been wrong about the truthfulness of witnesses he had questioned in the past. Except for the first statement noted above, all the statements were permissible comments pursuant to *People v. Melton* concerning Machado's demeanor, motives, background, and the consistency of his statements. Reading Hembree's testimony in context, we do not find he improperly

testified concerning Machado's veracity, and most of his testimony was related to Machado's demeanor.

We further note the prosecutor did not improperly ask Hembree if Machado testified truthfully. When the prosecutor generally asked how Machado "was" when he answered questions, Hembree replied, "He was truthful to the—like you said, he was truthful to the point of almost being self-incriminating." This was not improper commentary constituting prosecutorial misconduct as asserted by defendants. (See *People v. Zambrano* (2004) 124 Cal.App.4th 228, 239–241, 243 [prosecutor used reprehensible method to persuade jury defendant was lying and not credible].) The prosecutor focused his questions to Hembree on Machado's general demeanor. In sum, defendants have failed to demonstrate Hembree's testimony concerning Machado's demeanor constituted error or prosecutorial misconduct.

## VI. Martinez's Severance Motion[*]

### A. Introduction

After presenting evidence from Avellanoza's girlfriend of his good character for not being violent, the People were permitted to impeach that testimony with evidence of pending charges against Avellanoza for a gang shooting at a nightclub in Bakersfield. Medrano, joined by Martinez, argues the trial court violated their statutory and constitutional rights by denying their motion to have their cases severed from Avellanoza's case. The trial court did not err in denying defendants' severance motion.[8]

### B. Facts and Proceedings

During pretrial in limine motions, the prosecutor sought to bring in evidence of Avellanoza's involvement in a gang shooting in which he allegedly shot and killed a rival gang member at a nightclub in Bakersfield. The court conducted a brief hearing pursuant

[*]See footnote, *ante*, page 1.

[8]We reject the People's argument Martinez forfeited this issue at trial. The record unequivocally shows the attorneys for both Medrano and Martinez brought a motion to sever their clients' cases from Avellanoza's case.

51.

to Evidence Code section 402. Guillermo Barajas, Jr., testified he went to a rave at The Dome, a nightclub in Bakersfield, on February 15, 2011. A dispute broke out and as Barajas and his companions were about to leave, Barajas was "jumped" and there was a fight. Barajas said that when he talked to police officers about the incident, he was truthful and honest with them. Barajas was with his cousins and Avellanoza. Barajas did not want to see Avellanoza convicted. Barajas explained he was knocked out and did not know what was going on that evening.

As an offer of proof, the prosecutor explained to the court that because Barajas was not being truthful, the prosecutor would impeach Barajas with his prior statement to police that there was an altercation with South Side gang members who said something about "13." Barajas was approached by someone who started a fistfight. Barajas escaped with one of his cousins in a black Lincoln Navigator where Avellanoza was seated. Avellanoza used a pistol to shoot the person who started the altercation. The victim of the shooting later died. The prosecutor sought to introduce this testimony because Avellanoza was charged as a Northerner gang member. The trial court found the evidence inadmissible under Evidence Code sections 352 and 1101 in the prosecution's case-in-chief, but ruled the gang expert could testify concerning the incident as part of his expert opinion.

During trial, Avellanoza's attorney called Avellanoza's girlfriend, Leonora Penalosa, as a character witness. Leonora testified Avellanoza never threatened Machado, did not pull a gun on him, there was no gun in the Penalosa residence, and she did not think Avellanoza was a violent person. On cross-examination by the People, Leonora admitted she was aware from newspaper accounts of Avellanoza's identification as the shooter of a Sureño gang member in Bakersfield who later died. This did not change Leonora's opinion Avellanoza was not a violent person.

The attorneys for Medrano and Martinez both brought motions during the trial to sever the allegations against their clients from Avellanoza's case. Because of the shot-

caller evidence against Martinez, Medrano's attorney acknowledged the impeachment testimony was not as impactful on his client but argued it was still unduly prejudicial. The trial court noted gang cases have evidence that flows over between defendants. The court found Leonora's testimony was that Avellanoza was not a violent person who used guns, and the People sought to impeach her testimony. Because of the gang and gun allegations, the court denied defendants' motions to sever their case from Avellanoza's case.

Barajas was called as a witness outside the presence of the jury. Barajas refused the prosecutor's offer of use immunity, refused to testify, and invoked his Fifth Amendment right against self-incrimination. Barajas was found to be an unavailable witness. Barajas's prior sworn testimony from the Evidence Code section 402 hearing was read into the record.

Bakersfield Police Sergeant Martin Heredia testified he investigated the February 2011 shooting at The Dome. Heredia contacted Barajas, who had obvious facial injuries. Barajas told Heredia he was asked where he was from. Barajas's group went outside with the other group and a fight began. Barajas said he was knocked down and then assisted into the vehicle he had arrived in from Delano. Avellanoza was in the vehicle and fired shots from it. Barajas had heard the words "South Side" and "13" during the altercation. Heredia located the victim of the shooting, who had one bullet wound to his body.

### C.    Analysis

We review a trial court's denial of a severance motion for abuse of discretion based on the facts available when the court ruled on the motion. If the trial court abused its discretion, reversal is required only if it is reasonably probable the defendant would have obtained a more favorable result at a separate trial. If the trial court's joinder ruling was proper when it was made, a judgment may only be reversed on a showing joinder was so grossly unfair it amounted to a denial of due process. Where a defendant is

53.

charged with codefendants of having committed common crimes involving common events and victims, the trial court is presented with a classic case for a joint trial. (*People v. Burney* (2009) 47 Cal.4th 203, 237; *People v. Lewis* (2008) 43 Cal.4th 415, 452–453, overruled on another point in *People v. Black* (2014) 58 Cal.4th 912, 919–920.)

Joint trial has been prescribed and broadly allowed by the Legislature's enactment of section 954. Joint trials are proper where charges are connected together in their commission. (*People v. Soper* (2009) 45 Cal.4th 759, 771–772.) For a defendant to establish error where charges, or in this case defendants, are properly joined, he or she must make a clear showing of prejudice. The trial court's ruling amounts to a prejudicial abuse of discretion only where the ruling falls outside the bounds of reason. (*Id.* at p. 774.) In determining the cross-admissibility of other crimes evidence, reviewing courts consider whether the charges are likely to inflame the jury against the defendant, whether a weak case has been joined with a strong case, or whether one of the charges but not the other is a capital offense. (*Id.* at p. 775.)

Defendants were charged with the same offenses against the same victim. Joinder of all three defendants into one trial was proper, and the trial court did not abuse its discretion in denying Medrano's and Martinez's motions to sever their cases. The alleged crime in Bakersfield was not particularly cross-admissible as to Medrano and Martinez. It was admitted as evidence to impeach Avellanoza's character. The challenged evidence, however, was not inflammatory to either Medrano or Martinez, who were not in any way implicated in the Bakersfield shooting. Also, this case is not a capital case and there was no evidence before the jury to suggest the Bakersfield case was a capital case. The Bakersfield case was a chance encounter at a nightclub.

Furthermore, the jury was instructed the Bakersfield shooting could only be considered for the limited purpose of determining whether Avellanoza had a motive to commit the offenses. Medrano and Martinez were not referred to in the instruction, only Avellanoza. On appeal, we presume the jurors understand, correlate, and follow the

court's instructions.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1502; *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1181.)  We conclude Medrano and Martinez were not sufficiently prejudiced by the impeachment testimony directed to Avellanoza to call into question the fairness of their trial.  The trial court did not abuse its discretion in denying their severance motion.

## VII.   Alleged Ineffective Assistance of Counsel[*]

Avellanoza contends his trial counsel was ineffective for introducing character evidence that opened the door to impeachment of Leonora Penalosa with other crimes evidence of his involvement with a shooting in Bakersfield.  We reject this contention.

The defendant has the burden of proving ineffective assistance of trial counsel.  To prevail on a claim of ineffective assistance of trial counsel, the defendant must establish not only deficient performance, which is performance below an objective standard of reasonableness, but also prejudice.  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Tactical errors are generally not deemed reversible.  Counsel's decisionmaking is evaluated in the context of the available facts.  To the extent the record fails to disclose why counsel acted or failed to act in the manner challenged, appellate courts will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.  Prejudice must be affirmatively proved.  The record must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  (*People v. Maury*, *supra*, 30 Cal.4th at p. 389.)  Attorneys are not expected to file futile motions.  (*Id.* at p. 390.)

The evidence against Avellanoza was particularly strong.  In addition to knowing Avellanoza and holding him at gunpoint for allegedly trying to steal his neighbor's property, Machado had the clearest view of Avellanoza during the gun battle.  The two

---

[*]See footnote, *ante*, page 1.

were only a few feet apart from one another as they exchanged shots. Avellanoza kicked down Machado's door, removing any obstruction to Machado's view of him. Given the strength of the People's case against Avellanoza, it was not unreasonable for his defense counsel to try to draw a human portrait of Avellanoza through Leonora Penalosa's testimony.

Avellanoza argues in both his opening and reply briefs that trial counsel should have known he was opening the door to impeachment evidence and there was no "urgent constraint to present good character evidence." The People respond the trial court's earlier ruling under Evidence Code sections 352 and 1101, subdivision (a) barred evidence of the prior shooting except for the purposes of the gang expert's testimony. The gang expert, however, did not rely on the Bakersfield shooting as a basis for his opinion that Avellanoza and his codefendants were members of the Norteño gang. Given the trial court's pretrial ruling and the absence of testimony by the gang expert permitted by the trial court, it was not unreasonable for Avellanoza's attorney to calculate the prosecutor would not impeach Leonora Penalosa's testimony with evidence of the Bakersfield shooting.

In *People v. Little* (2012) 206 Cal.App.4th 1364 (*Little*), defense counsel questioned an investigator concerning the defendant's statement during detention that he had been to a church event. Defense counsel asked the investigator if he had investigated the defendant's alibi. The investigator replied he did not because there were five churches nearby, it was Sunday, and they all had functions that day. (*Id*. at p. 1373.) Although the defendant did not testify, the prosecutor sought to impeach the defendant with prior convictions because the defense elicited exculpatory evidence attributed to the defendant. The court permitted the impeachment evidence. (*Id*. at pp. 1373–1374.)

On appeal, Little raised a challenge to his trial counsel's effectiveness because his trial counsel's tactic led to introduction of Little's prior convictions. The court in *Little* noted its review of counsel's performance is a deferential one, and a fair assessment of an

attorney's performance requires every effort to eliminate the distorting effects of hindsight. Reviewing courts indulge in the strong presumption counsel's conduct falls within the wide range of reasonable professional conduct. (*People v. Little*, *supra*, 206 Cal.App.4th at p. 1380.) The court noted defense counsel's strategy was sound because without his client testifying, defense counsel introduced evidence to the jury of an alibi. *Little* reasoned that although there was a risk of prior conviction evidence being presented for impeachment, the prosecution may not have raised the point and trial counsel's strategy was viable. (*Ibid*.) Counsel's tactical decisions are accorded substantial deference. (*People v. Riel* (2000) 22 Cal.4th 1153, 1185.)

We find this case analogous to *Little* on Avellanoza's challenge to the effectiveness of his trial counsel. The evidence that Avellanoza was the direct perpetrator of the shooting was strong. Defense counsel could not know to a certainty that Leonora Penalosa's character evidence would be impeached with evidence Avellanoza was involved in the Bakersfield shooting. We refuse Avellanoza's invitation to engage in the distorting effects of hindsight and find trial counsel's strategy to be viable and within the wide range of professional conduct.

Even if we were to find trial counsel's tactic to be below professional standards, evidence of the Bakersfield crime did not change the outcome of what was otherwise a strong prosecution case. Avellanoza presented an alibi defense clearly rejected by the jury. Aside from the gang evidence, the prosecutor presented strong evidence of Avellanoza's motive to shoot Machado after Machado had held Avellanoza at gunpoint until law enforcement could arrest Avellanoza for attempting to steal from Machado's neighbor. Avellanoza cannot demonstrate that absent the alleged error, the verdict would have been different. Avellanoza has not shown prejudice, and his assertion trial counsel was ineffective fails.

## VIII. Great Bodily Injury[*]

Avellanoza, joined by Medrano, contends Machado's wound from being shot was not great bodily injury under section 12022.7 or 12022.53, subdivision (d).  Avellanoza argues Machado did not go to the hospital after being shot and never sought medical attention for his wound.  We reject this contention.

Great bodily injury is defined as a significant or substantial physical injury as distinguished from injuries that are trivial or cause only moderate harm.  (§ 12022.7, subd. (f); *People v. Cross* (2008) 45 Cal.4th 58, 63–64; *People v. Escobar* (1992) 3 Cal.4th 740, 749–750.)  Our Supreme Court has long held the question of whether a victim has suffered great bodily injury is a factual inquiry to be resolved by the jury, not a question of law for the court.  There can be a fine line dividing a significant or substantial injury from one not meeting the description.  (*People v. Cross*, at p. 64; *People v. Escobar*, at pp. 750–752.)  Great bodily injury "is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury."  (*Cross*, at p. 66.)

A finding of great bodily injury will be sustained when there is "some physical pain or damage, such as lacerations, bruises, or abrasions."  (*People v. Washington* (2012) 210 Cal.App.4th 1042, 1047.)  For example, a great bodily injury finding was sustained where the victim suffered a severely swollen jaw, sore ribs for two weeks, cuts to the arms, and bruises to the head, neck, and back.  (*People v. Corona* (1989) 213 Cal.App.3d 589, 592, 594.)  The finding was also sustained where the victim was strangled with a scarf to the point of nearly passing out, felt herself choking, could not breathe, had a swollen eye and bleeding nose, saw blood on herself, felt pain in her neck, and had a large lump on her neck.  (*People v. Mixon* (1990) 225 Cal.App.3d 1471, 1489.)

The victim in *People v. Le* (2006) 137 Cal.App.4th 54, 57–58 was struck by a bullet traveling through his left leg into his right inner thigh and lodged in his right outer

---

[*]See footnote, *ante*, page 1.

thigh.  The victim sustained muscle injury to both legs.  After the bullet was recovered, the victim was released from the hospital after 24 hours and could not work for a week after the shooting.  (*Ibid*.)  The court in *Le* rejected the argument that soft tissue injuries were legally insufficient and held the injuries were great bodily injury within the meaning of sections 12022.7 and 12022.53, subdivision (d).  (*Le*, at pp. 59–60.)

The California Supreme Court reached the same result where a bullet hit the victim's leg, shattered, and left fragments on the victim's arms and legs, causing muscle injury.  The doctor removed one bullet fragment and left the other bullet fragments to work their way out.  The victim lost little blood and no sutures were used.  The victim was released from the hospital and went to work the next day.  (*People v. Wolcott* (1983) 34 Cal.3d 92, 107–108.)

The victim in *People v. Mendias* (1993) 17 Cal.App.4th 195, 201 was shot in the upper left thigh.  The wound burned, causing the victim to cry.  The victim was admitted to the hospital, treated for his gunshot wound, and released the next day.  The bullet was not removed, and five months later at trial the victim testified the bullet moves but is not painful when it does so.  (*Ibid*.)  The court concluded there was substantial evidence of great bodily injury.  (*Id*. at pp. 205–206.)

In *People v. Lopez* (1986) 176 Cal.App.3d 460, 462, one victim was shot in the right buttock but felt nothing because he was dazed.  The second victim was shot in the left leg, with the bullet penetrating and exiting the thigh.  The second victim felt "fire" in her leg but was able to drag the first victim to safety.  The court found substantial evidence of great bodily injury to both victims because "the penetrating wounds suffered by [the victims] cannot be considered superficial."  (*Id*. at p. 465.)

Avellanoza compares his case to *People v. Taylor* (2004) 118 Cal.App.4th 11.  In *Taylor*, the jury found the great bodily injury allegations under section 12022.7 not to be true but made serious bodily injury findings elsewhere in the verdicts.  (*Taylor*, pp. 22–23.)  Noting serious bodily injury and great bodily injury have different statutory

definitions, the court in *Taylor* found the jury's verdicts were not inconsistent. (*Id.* at pp. 24–25.)

Machado acknowledged he did not go to the hospital or seek other medical attention after being shot. He did testify the wound hurt, making it difficult for Machado to work, and it became infected. On our own motion, we called up exhibit 17, a color photograph taken by investigators soon after the shooting. The jury viewed exhibit 17 in addition to listening to Machado's testimony. The photograph depicts a wound that entered and exited a path along Machado's top left shoulder. A measuring ruler next to the wound indicates the length of the wound is about 7.5 centimeters. The wound goes through flesh and muscle. It is not a superficial skin wound.

There was substantial evidence before the jury that Machado suffered great bodily injury even though the bullet exited his shoulder and he did not seek medical attention.

## IX. Gible Gang Evidence and Convictions[*]

### A. Introduction

Defendants contend the trial court erred in denying their motion to bifurcate the gang allegations from the other allegations. Defendants raise issues challenging the admissibility of most of the gang evidence admitted at trial based on two California Supreme Court cases, *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*) and *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). *Elizalde* held incriminating gang association information provided by inmates from un-*Mirandized* jail identification cards is inadmissible. *Sanchez* held gang experts cannot rely on hearsay information to establish case-specific information proving a defendant's gang membership or past gang-related offenses because it violates both the hearsay rule and the confrontation clause of the Sixth Amendment. Defendants further assert there was insufficient evidence to establish the gang enhancements and substantive gang offense. Martinez, joined by his codefendants,

---

[*]See footnote, *ante*, page 1.

contends the trial court erred in denying his motion to bifurcate the gang allegations from the other allegations.

After carefully reviewing the record, it is clear jail identification information was admitted for all three defendants. There is no indication in the forms filled out by defendants, nor was there any evidence adduced at trial, that defendants were *Mirandized*. This information of gang identity was inadmissible pursuant to *Elizalde*. The record further establishes that case-specific hearsay information was admitted into evidence on both the gang and non-gang allegations in violation of the hearsay rule and the confrontation clause as analyzed in *Sanchez*. We find *Elizalde* and *Sanchez* error was not forfeited by the parties, and both cases apply retroactively. We further find the error affected the gang allegations, necessitating reversal of count 5 and the gang enhancements. We conclude, however, that under a *Chapman* standard of review, any error in the presentation of inadmissible gang evidence did not affect the remaining counts and allegations. Because there was substantial evidence of the gang allegations, the People may refile the gang-related charges on remand.

### B.      Forfeiture and Retroactivity

The People argue the confrontation clause claim was forfeited on appeal for failure to raise the issue to the trial court. The People note defendants objected to the admissibility of hearsay testimony by the gang expert on grounds the evidence was based on an inadequate foundation, was unreliable, irrelevant and speculative, violated Evidence Code section 352, and violated defendants' due process rights. According to the People, the parties failed to raise a confrontation clause issue.

There are several reasons why we reject the People's forfeiture argument. Although defendants did not expressly cite to *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), counsel for Medrano argued during the Evidence Code section 402 hearing that hearsay information related by the gang expert, Detective Sanchez, came from Melesio Valdez Duran, "a witness that has never been produced at any hearing."

Counsel further argued no one had "provided any real evidence," and the evidence from this witness would be "a hearsay upon a hearsay upon a hearsay statement unless we go through this hearing to find out exactly what it is and [its] reliability." Counsel noted the information, ultimately going to the prosecutor's portrayal of Martinez as a shot-caller for the gang, provided the prosecution "with a motive and a theory of motive beyond what has already been presented" by Machado as "a possible motivation."

The prosecutor replied "gang experts routinely rely on statements contained in police reports to form the basis for their opinion and that has been upheld in several cases." The prosecutor argued Detective Zaragoza, who testified earlier but not on this issue, took a recorded statement from Melesio Valdez that was presented to the defense as a documented police report. During the hearing, Sanchez testified Zaragoza contacted ex-Norteño gang member Melesio Valdez, and during an "interview Valdez identified Martinez as being a shot caller for the Norteños out of the Earlimart and Delano area." The trial court initially found this admissible as the type of evidence properly relied upon by a gang expert. The court limited the admissibility of this evidence to the expert's opinion.

Defense counsel for Medrano continued his challenge to the evidence later, arguing there was already evidence from the prosecution concerning how defendants disliked Machado. Counsel argued the prosecution was bootstrapping its case further by adding information about the gang trying to collect taxes, entering inadmissible evidence through the back door and violating Evidence Code section 352.

Especially as to evidence that Martinez was a shot-caller for the gang, defendants were arguing the confrontation clause was being violated without expressly using the phrase "confrontation clause" or citing to *Crawford*. The court limited evidence concerning the prosecution's theory that Martinez attacked Machado to collect taxes for the gang, but ruled the expert could rely on hearsay that Martinez was a shot-caller who collected money for the gang. From other arguments made by defense counsel, it is clear

all of the parties were aware other hearsay police reports were coming into evidence. It is clear from the record and statements by the trial court, however, that any further attempt by defense counsel to limit hearsay statements in police reports would have been futile.

The primary controlling authority permitting gang expert reliance on hearsay statements, including from police reports, was *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*). The People rely on more recent Supreme Court authorities raising confrontation clause issues, arguing defendants' trial attorneys were on notice of the confrontation clause as an issue. The cases cited by the People are unpersuasive because they either did not find a violation of the confrontation clause or, if one was found, it was held to be harmless. (*People v. Lopez* (2012) 55 Cal.4th 569, 576–585 [admission of blood-alcohol test results did not violate right to confrontation, a notation linking defendant's name to a particular blood sample not testimonial, and any violation of Sixth Amendment harmless beyond reasonable doubt]; *People v. Dungo* (2012) 55 Cal.4th 608, 617–621 [statements in autopsy report describing condition of murder victim's body were not testimonial under confrontation clause]; *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 659–662 [testimony of laboratory director who did not perform drug tests submitted by prosecution violated confrontation clause but was harmless error in light of other, overwhelming evidence].)

The remaining authority cited by the People to establish forfeiture is *People v. Waidla* (2000) 22 Cal.4th 690, 726, footnote 8, where the Supreme Court rejected the confrontation clause and due process arguments on appeal because there had not been timely and specific objections to the trial court. We find *Waidla* distinguishable, especially concerning the hearsay shot-caller testimony, because Medrano's counsel and the prosecutor substantively argued the confrontation clause. Also, the *Waidla* decision was made four years prior to the United States Supreme Court's decision in *Crawford*.

The California Supreme Court has recently rejected the People's claim of forfeiture, acknowledging *Crawford* was a dramatic departure from prior confrontation

63.

clause case law, it was decided after the complaining defendant's trial, and counsel could not reasonably have anticipated the change in the law. (*People v. Harris* (2013) 57 Cal.4th 804, 840.) Although *Crawford* had been decided prior to defendants' trial, the California Supreme Court's decision in *Sanchez* was a significant divergence from its prior, controlling decision in *Gardeley*. The *Sanchez* case was also a dramatic departure by the California Supreme Court's treatment of hearsay testimony by gang experts and was decided after defendants' trial. The most significant testimonial hearsay statement permitted by the trial court was the shot-caller testimony, which had been properly objected to.

Although the issue of un-*Mirandized* jail intake information concerning gang affiliation was not raised by defendants' counsel in pretrial hearings, *Elizalde* had not been decided at the time of trial and *Gardeley* was the state of the law in California. Un-*Mirandized* jail intake information is now inadmissible pursuant to *Elizalde* for violating a defendant's Fifth Amendment rights and can also be inadmissible pursuant to *Sanchez* for violating a defendant's Sixth Amendment right to confrontation. Such evidence was admitted into evidence here against all three defendants.

There is no duty to object when the existing state of the law would render an objection futile. (*People v. Chavez* (1980) 26 Cal.3d 334, 350, fn. 5.) Given the trial court's evidentiary rulings throughout the proceedings finding the gang expert could rely on hearsay information, it also would have been futile for defendants to have lodged confrontation clause objections to each piece of case-specific hearsay evidence introduced by the prosecution through the testimony of Detective Sanchez. We do not find the People's forfeiture argument persuasive.

The confrontation clause argument in *Crawford* has also been found to be retroactive for cases such as this, which are still on appeal, even though it was announced after a defendant's trial. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1158.) The

decision in *Sanchez* was made after defendants' trial during the pendency of the instant appeal and can be applied retroactively.

### C.    Prosecutor's Theory and Argument to Jury

In establishing the three defendants were members of a criminal gang, the prosecutor referred to jail booking records for all three defendants, exhibits 96 through 100, noting each defendant self-admitted association with the Northerner gang. The prosecutor explained the People do not have to prove motive, but in reaching its decision, the jury could consider whether defendants had a motive because motive tends to show a defendant is guilty.

In arguing defendants' motive for the crimes, the prosecutor noted the jury heard a lot of testimony about gang motives and activities, adding, "[W]hat I think is crucial you take back when you deliberate is these gang motives." The prosecutor asked the jury to consider gang motives as a reason why there was retaliation against Machado, who had "not … play[ed] nice with" defendants. The prosecutor further noted Machado had been in fights with defendants and held Avellanoza at gunpoint. According to the prosecutor, this explained Detective Sanchez's testimony concerning why defendants retaliated against Machado on behalf of the gang. For the gang, when someone cooperates with law enforcement, it's "open season on them."

The prosecutor told the jury it had heard a lot of testimony concerning Detective Sanchez's opinion defendants were gang members. The jury heard about someone hearing "South Side" and, after a fight, "13" was said. There was ongoing gang activity by Avellanoza, who was willing to work for the gang and work his way up in the gang. According to the prosecutor, Avellanoza was "willing to retaliate when disrespected and that is why this crime was committed." The prosecutor said the same thing of Martinez, who had admitted his own gang activity. The prosecutor pointed to evidence of Martinez's gang tattoos.

The prosecutor further indicated Medrano was "clearly a member of the [N]orthern gang." The prosecutor mentioned the physical attack of Machado when Martinez nodded to Medrano before the attack. The prosecutor described Martinez as "shot-caller for the [N]orthern gang in this area." The prosecutor mentioned indicia of gang membership found in Medrano's room, including the Huelga bird on his monitor, graphics indicating "X4," a gang symbol, and the name "Pixlon," a clique of the Northerner gang. There were also gang lyrics on Medrano's PlayStation. In what he described as the layers and layers of gang evidence, the prosecutor directed the jury's attention to police reports and shooting incidents. Medrano was identified by a victim as taking directions from Martinez.

Turning to the allegations for attempted murder (count 1), burglary (count 2), shooting at an inhabited dwelling (count 3), and assault with a firearm, the prosecutor noted attempted murder had to be willful, deliberate, and premeditated. The prosecutor initially emphasized that counts 1 through 4 all had gang enhancements. Turning more specifically to attempted murder, the prosecutor explained Avellanoza entered the residence, shot at, and hit Machado.

The prosecutor rhetorically asked how all three defendants could be held legally accountable. The prosecutor posited three theories of liability: direct liability, aiding and abetting the crime, or an uncharged conspiracy based on an agreement to commit assault with a deadly weapon. The prosecutor argued Martinez and Medrano were culpable because they also entered Machado's residence armed with guns and shot at him through the wall of his bedroom.

After reviewing the law of uncharged conspiracy and the common purpose defendants had in shooting Machado, the prosecutor explained defendants were criminally liable. The prosecutor turned to the issue of premeditation and deliberation for attempted murder, arguing all three defendants acted with one state of mind, though not all of them had to have acted in the shooting. The prosecutor explained the burglary was

66.

committed with the intent to commit assault with a deadly weapon or attempted murder. After going over the elements of the other charged offenses, the prosecutor turned to the substantive gang offense (count 5) and explained the elements of that crime. The prosecutor emphasized Martinez was a shot-caller, and the crimes committed against Machado were at the direction of the gang. Multiple shooters were used to instill fear of the gang.

### D. *Elizalde* Holding

We granted Avellanoza's request to file a supplemental brief raising the issue the statements made by defendant to deputies when he was being admitted to the jail and the written jail information cards were inadmissible because there was no showing Avellanoza had been given his rights pursuant to *Miranda*. In June 2015, our Supreme Court unanimously ruled in *Elizalde*, *supra*, 61 Cal.4th at pages 527, 533–540, that certain *Miranda* advisements must be given before a suspect's statement made during a custodial interrogation can be admitted in the prosecution's case-in-chief. Avellanoza contends the facts of this case fall squarely within the holding of *Elizalde* and, further, unlike that case, the evidence demonstrating his gang affiliation outside the jail intake cards was too weak for us to find the error was not prejudicial.

*Elizalde* held the unadmonished answers to questions of a defendant in jail involving gang affiliation are inadmissible. Furthermore, *Elizalde* found the narrow public safety exception to *Miranda* did not apply to the jail intake process. (*Elizalde*, *supra*, 61 Cal.4th at pp. 533–540.) The court in *Elizalde*, however, ultimately found any error in the admission of un-*Mirandized* jail intake information regarding gang affiliation was harmless beyond a reasonable doubt under the standard of review set forth in *Chapman*, *supra*, 386 U.S. 18. The court in *Elizalde* found the remaining evidence of a defendant's gang affiliation was convincingly established by other witnesses and evidence, and the error was not prejudicial. (*Elizalde*, at p. 542.)

Following *Elizalde*, this court recently held the failure to give a *Miranda* warning to a jail inmate during intake made his statements regarding gang affiliation inadmissible. (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1015–1016.)  As in *Elizalde*, this court found in *Leon* there was no prejudice beyond a reasonable doubt because there was other evidence establishing the defendants' gang connections.  (*Leon*, at pp. 1020–1022.)

We note there is no direct evidence in the current record concerning whether defendants were given their *Miranda* rights before they filled out the information sheets for the jail indicating affiliation with the Northerner gang.  There was no testimony regarding this point by the jail intake deputy.  For the purposes of our analysis, we assume Medrano and Avellanoza did not receive *Miranda* warnings after their arrests for the current charges or while being admitted to the county jail.[9]

### E.   *Sanchez* **Holding**

The Sixth Amendment's confrontation clause grants a criminal defendant the right to confront adverse witnesses.  (U.S. Const., 6th Amend.)  Thus, the admission of testimonial hearsay is barred by the confrontation clause unless the speaker is unavailable to testify and the accused previously had the opportunity to cross-examine the speaker, or the accused has forfeited the right to do so by his or her own wrongdoing.  (*Crawford*, *supra*, 541 U.S. at p. 68.)  In *Sanchez*, our Supreme Court found the holding in *Crawford* applicable to testimonial hearsay information of a defendant's past gang affiliation and activity.  (*Sanchez*, *supra*, 63 Cal.4th at pp. 679–685.)  The *Sanchez* case noted, however, that a gang expert's background testimony about general gang behavior or descriptions of a gang's behavior in a community is relevant and admissible evidence as to the gang's history and general operations and based on well-recognized sources of the expert's area of expertise.  (*Id.* at p. 698.)

---

[9]As explained, *post*, Martinez was given *Miranda* warnings after his arrest for the current offenses, waived his rights, and told detectives he belongs to the Northerner gang.

*Sanchez* found that when an expert relates case-specific out-of-court statements to the jury, and the content of those statements are treated as true and accurate to support the expert's opinion, the statements are hearsay. *Sanchez* disapproved prior precedent to the extent it held an expert's opinion is not hearsay because any statements related by the expert go only to the basis of the expert's opinion. *Gardeley* was expressly disapproved on this ground. *Gardeley* was further disapproved for finding the potential prejudicial impact of the expert's testimony was overcome by limiting instructions to the jury. (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13.) The court explained "an expert's testimony regarding the basis for an opinion *must* be considered for its truth by the jury." (*Id.* at p. 679.)

The court also clarified an expert is permitted to rely on hearsay in forming an opinion and may tell the jury so in general terms. "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Sanchez, supra*, 63 Cal.4th at p. 686.) Case-specific facts are those that the expert has no independent knowledge of and relate "to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.) Typically, parties establish these facts by calling witnesses who have personal knowledge to testify to those facts. The expert then renders an opinion as to what those facts may mean. Thus, the expert is simply prohibited from *supplying* those case-specific facts not within the expert's personal knowledge. (*Ibid.*)

In light of California's hearsay rules and *Crawford*, *Sanchez* held that a court addressing the admissibility of out-of-court statements must engage in a two-step analysis.

> "The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a

second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term." (*Sanchez*, *supra*, 63 Cal.4th at p. 680.)

Statements not offered for their truth are not hearsay, and neither the hearsay doctrine nor the confrontation clause is implicated. (*Sanchez*, *supra*, 63 Cal.4th at p. 681.) Concerning the use of limiting jury instructions on a gang expert's reliance on hearsay involving case-specific facts, *Sanchez* observed there was no denying such facts were being considered by the expert and offered to the jury as true. The jury was instructed it must decide whether the information the expert relied upon was true and accurate. However,

> "[w]ithout independent competent proof of those case-specific facts, the jury simply had no basis from which to draw such a conclusion. The court also confusingly instructed the jury that the gang expert's testimony concerning 'the statements by the defendant, police reports, F.I. [field identification] cards, STEP notices, and speaking to other officers or gang members' should not be considered 'proof that the information contained in those statements was true.' Jurors cannot logically follow these conflicting instructions. They cannot decide whether the information relied on by the expert 'was true and accurate' without considering whether the specific evidence identified by the instruction, and upon which the expert based his opinion, was also true." (*Id.* at p. 684.)

Elaborating on the deficiency of jury instructions and its impact on considerations of hearsay and the right to confrontation, *Sanchez* recognized the jury must consider expert basis testimony for its truth. If an expert testifies to case-specific out-of-court statements to explain the bases for his or her opinion, those statements are necessarily considered by the jury for their truth, rendering them hearsay. Like any other such evidence, it must be properly admitted through an applicable hearsay exception. (*Sanchez, supra*, 63 Cal.4th at p. 684.) In *Sanchez*, the gang expert testified to case-specific facts based upon out-of-court statements and asserted those facts were true because he relied on their truth in forming his opinion, thus reciting hearsay. Although hearsay would ordinarily constitute statutory error, under *Crawford*, if the hearsay is testimonial and *Crawford*'s exceptions do not apply, the defendant should have the right

70.

to cross-examine the declarant or the evidence should have been excluded. (*Sanchez*, at p. 685.)

The *Sanchez* court observed testimonial statements are those "made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony," while nontestimonial statements are "those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Sanchez*, *supra*, 63 Cal.4th at p. 689.) In *Sanchez*, the gang expert testified to the defendant's prior contacts with police. He learned about several of the prior contacts solely through police reports compiled during the investigation of completed crimes. (*Id.* at p. 694.) The court held the contents of the police reports were testimonial—they were compiled during a police investigation of completed crimes, and the expert relied upon and related case-specific facts from a narrative by the investigating officer. (*Ibid.*)

The court further found field identification cards, used to show a defendant had a prior contact with police while in the company of a known gang member, could be testimonial if the card was produced during the course of an ongoing criminal investigation. (*Sanchez*, *supra*, 63 Cal.4th at p. 697.) The *Sanchez* court could not conclusively determine whether the card was produced in the course of an ongoing investigation, rendering it testimonial because the circumstances surrounding the preparation of the field identification card were unclear. (*Ibid.*)

The gang expert in *Sanchez* related the contents of statements made in a STEP notice (Street Terrorism Enforcement and Prevention Act, § 186.20 et seq.). (*Sanchez*, *supra*, 63 Cal.4th at p. 696.) A STEP notice is issued to inform the recipient he or she is associating with a known gang member. In completing the STEP notice, the issuing officer made a sworn declaration under penalty of perjury the representations made therein were true. (*Sanchez*, at pp. 696–697.) Although the STEP notices could serve many purposes, including a general community policing function, the court determined

the notices were testimonial because they were signed under penalty of perjury and "memorialize[d] any incriminating statements for future evidentiary use." (*Id.* at p. 696.)

In determining how to evaluate the effect of confrontation clause errors, the Supreme Courts of the United States and California have found the error is evaluated pursuant to the harmless error analysis standard set forth in *Chapman*, *supra*, 386 U.S. 18—the error must be harmless beyond a reasonable doubt. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684; *People v. Cage* (2007) 40 Cal.4th 965, 991–992; see *Sanchez*, *supra*, 63 Cal.4th at pp. 698–699.)

### F. Analysis of Gang Allegations

There was admissible gang evidence, though nearly all of the case-specific gang evidence presented by Detective Sanchez was inadmissible under *Sanchez* and *Elizalde*. The evidence secured after the execution of search warrants in the homes of Medrano and Martinez showing indicia of gang membership was admissible. In Medrano's residence, this included a Nor Cal flag, a reference to North Side Pixlon, a subset of the Norteño gang, a Huelga bird flag, and a desktop screen image on his computer with the Huelga bird. A PlayStation 3 was hooked up to a monitor. Sanchez personally listened to Norteño gang lyrics with gang slurs disrespecting rival gangs. One example was the term "scraps" in a lyric referring to the rival Sureño gang. Three other people lived in Medrano's residence, though family members indicated the room where gang indicia was found was Medrano's room.

Investigators searching Martinez's residence found a photograph depicting Martinez with another male and a female. The male was flashing the Northerner gang hand sign "4" and wearing a Giants jersey of a reddish color. Also, Martinez had numerous gang tattoos and admitted being a Northerner gang member after his arrest when he was read his *Miranda* rights.

The other admissible evidence submitted by the People included the background and history of the Norteño gang provided by Detective Sanchez, a gang expert, and the

predicate offenses to establish the Norteños as a criminal street gang. No objections were lodged to the official documents establishing the predicate offenses.

There was much evidence admitted in violation of *Sanchez* and *Elizalde* against all three defendants. Relying on police reports, Sanchez testified Avellanoza was involved in a traffic stop in June 2008, investigated for brandishing a firearm in June 2009, and involved in an incident with his girlfriend in November 2009 in which he revealed his gang affiliation. He did so again on a jail booking form, admitted as exhibits 96 and 97, after being arrested in February 2011.

Inadmissible evidence directed to Medrano came from police reports indicating he had been shot or his home had been subject to a drive-by shooting twice, in November 2006 and in December 2006. According to Detective Sanchez, by implication, Medrano was a Norteño gang member. Jail booking information for Medrano's arrest in the instant action was admitted as exhibit 98.

Hearsay police report information also violating the confrontation clause was admitted from police arrests or contacts with Martinez in 1997 and 2007. A STEP notice was served on Martinez in early November 2010, which was also found inadmissible under *Sanchez*. Prison records from 2002 and 2008 indicating Martinez's gang affiliation were referred to by Detective Sanchez in his testimony. Martinez's jail identification information, which was presumably inadmissible under *Elizalde*, was admitted as exhibits 99 and 100. The most prejudicial evidence admitted against Martinez in violation of *Sanchez* was Melesio Valdez's alleged statement to Detective Zaragoza that Martinez was a known shot-caller and money collector for the Norteño gang. Although Zaragoza had testified earlier in the trial, he was not asked about this information. Even had Zaragoza testified concerning Valdez's statement instead of Detective Sanchez, it would still have been inadmissible testimonial hearsay under *Crawford* and *Sanchez*, although there would have been one less level of hearsay.

Defendants contend without the inadmissible testimonial gang evidence admitted at trial, there is not substantial evidence and the substantive gang offense must be dismissed. There was no admissible evidence, for instance, Avellanoza was a member of the Norteño gang. Although admissible evidence showing Martinez was a member of the gang was strong, there was no admissible evidence he was a money collector and shot-caller for the gang.

There was admissible evidence of Medrano's possession of gang paraphernalia linking him to the gang, though this evidence was not overwhelming. Most evidence of Medrano's gang membership came through hearsay and testimonial police reports that were inadmissible. The admissible evidence against Medrano presented at trial only established his possible association with the gang. The substantive gang offense requires proof a defendant is more than a nominal member of a street gang, with knowledge its members engage in a pattern of criminal gang activity, and who willfully promoted furthered or assisted in felonious criminal conduct by members of the gang. (*People v. Lamas* (2007) 42 Cal.4th 516, 524.)

Discounting inadmissible evidence, the People have failed to demonstrate Medrano and Avellanoza were more than nominal members or associates of the gang. The People have not shown Medrano and Avellanoza were willfully promoting felonious conduct with Martinez or other members of the gang. Because the shot-caller evidence as presented at trial was inadmissible, there is no nexus between Medrano and Avellanoza as gang actors with Martinez.[10] The People have not established all of the elements of the substantive gang offense for Medrano and Avellanoza.

---

[10]In oral argument, the People tried to establish a nexus between all three defendants as actors for a gang through the testimony of Detective Sanchez, who testified that members of gangs only commit crimes with fellow gang members. The People further argued that even if Martinez was the only established gang member, the presence of the other two defendants with him constituted substantial evidence all three defendants committed the underlying offenses for the gang. We do not agree with this assessment of the evidence because so much of the gang evidence was inadmissible, undermining the expert's opinion that the offense was for the gang.

74.

The substantive gang offense requires a person commit an underlying felony with at least one other gang member. (*Sanchez*, *supra*, 63 Cal.4th at p. 673, fn. 5; *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1134.) If only Martinez was a confirmed member of the gang, he and the others cannot be guilty of the substantive gang offense if the prosecutor failed to establish Martinez was acting with other established members of the gang. One of the elements of the gang enhancement is an ongoing association of three or more persons with a common name or identifying symbol. Also, the prosecution must show that the crime for which the defendant is convicted was committed for the benefit of, at the direction of, or in association with any criminal street gang with the intent to promote, further, or assist any criminal conduct by gang members. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047.) These requirements have not been shown in the absence of inadmissible evidence. The prejudicial effect of the inadmissible evidence undermines our confidence in the jury's true findings as to the gang enhancement allegations and defendants' convictions on count 5.

Even though the People's proof of the substantive gang offense is insufficient absent the inadmissible evidence presented at trial, the People can still retry count 5 without violating double jeopardy. This is so because reviewing courts must consider all the evidence admitted at trial and before the jury to establish whether there was substantial evidence. (*Lockhart v. Nelson* (1988) 488 U.S. 33, 39–42.) The double jeopardy clause does not bar retrial after a reversal based on the erroneous admission of evidence if the erroneously admitted evidence supports the conviction. (*U.S. v. Chu Kong Yin* (9th Cir. 1991) 935 F.2d 990, 1001; *People v. Cooper* (2007) 149 Cal.App.4th 500, 522; see *In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1509–1510.) The retrial of enhancements challenged for lack of sufficient evidence is also permitted for the same

Furthermore, all three defendants had a negative past history with Machado, giving them a motive to attack him aside from benefiting the gang.

reason because there was substantial evidence before the jury, though much of it was subsequently held to be inadmissible.

On remand, the People may elect to retry count 5 and the gang enhancement allegations. We note the People may be able to prove much of the testimonial hearsay evidence presented by Detective Sanchez through the admissible testimony of witnesses with direct knowledge of the truth of the matters asserted.

### G.    Convictions on Counts 1 Through 4

Defendants further contend the remaining allegations must also be reversed because the inadmissible gang evidence, especially the shot-caller evidence, was so prejudicial and inflammatory it affected all of the jury's deliberations. Although the inadmissible evidence may have affected the jury's assessment of counts 1 through 4 and the gun use enhancements, the evidence of premeditation and deliberation was so strong we find beyond a reasonable doubt the jury would have convicted all three defendants of counts 1, 2, and 4 and would have convicted Avellanoza of count 3.

We begin our evaluation by acknowledging the admission of tangentially relevant gang evidence is highly inflammatory. (*People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.) Gang evidence should not be admitted where its sole relevance is to show a defendant's bad character. Such evidence is admissible when the reason for the crime is gang related. (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.)

The prosecutor's theory of the case was defendants had gang motives to kill Machado. The prosecutor did not present substantial admissible evidence all three defendants were members of the Norteño gang. The prosecutor, however, did present admissible evidence that Martinez was a Norteño and had prior hostile encounters with Machado. Through the admissible general background and history of the Norteño gang presented through Detective Sanchez's testimony, there was admissible evidence before the jury that Martinez could have harbored an intent to attack Machado for the gang,

76.

aside from whether he was a money collector and shot-caller for the gang. There was substantial evidence before the jury all three defendants, aside from any gang association, had enmity for Machado from prior encounters and conflicts. There was substantial admissible evidence before the jury all three defendants had intent to kill Machado apart from inadmissible gang evidence.

Furthermore, the evidence of premeditated, deliberate, and willful conduct by all three defendants was particularly strong in this case. Machado described a truck driving slowly by his home late at night one-half hour prior to the attack. Immediately prior to the shootings, someone yelled "FBI" as a ruse prior to kicking down the door into Machado's home. The intruders methodically kicked down doors until they reached Machado's bedroom. Avellanoza kicked down Machado's door and began to fire at him multiple times and at nearly point-blank range. Medrano and Martinez were shooting at Machado through the bedroom wall at the same time. Many rounds of ammunition were expended during defendants' attempt to kill Machado. Martinez yelled at someone to go back inside and "get" Machado after they had exited the home. Upon hearing this, Machado exited his bedroom through a window and a fourth gunman began to shoot at him from behind a tree. Because of prior encounters with defendants, Machado was able to easily identify them all.

The abundance of evidence showing preplanning and organization along with the number of assailants involved in the attack clearly support the jury's verdicts for counts 1 through 4. Although the shot-caller evidence against Martinez was prejudicial, it was not so prejudicial that it undermines our confidence in the jury's verdict on counts 1 through 4. Even though the prosecutor argued a gang motive for all of the counts, the prosecutor also argued to the jury there was bad blood between defendants and Machado. The prosecutor accurately argued to the jury the People did not have to prove motive, and the jury was instructed with CALCRIM No. 370 that motive is not an element of attempted murder. The jury's evaluation of defendants' motive, however, does not affect its

77.

evaluation of the elements of attempted murder, burglary, or assault with a firearm because motive is not an element of these crimes.  Motive is not an element of murder. (*People v. Smith* (2005) 37 Cal.4th 733, 740.)

Attempted murder requires the specific intent to kill, along with the commission of a direct but ineffectual act toward accomplishing the attempted killing.  (*People v. Perez* (2010) 50 Cal.4th 222, 229–230.)  The evidence each defendant had the specific intent to kill Machado is very substantial.  We conclude, beyond a reasonable doubt, that absent the inadmissible gang evidence, the jury would still have convicted all three defendants of counts 1, 2, and 4, and convicted Avellanoza of count 3.

## X.    Bifurcation of Gang Allegations[*]

Defendants argue the trial court erred in denying their motion to bifurcate the gang issues.  The trial court has discretion to bifurcate issues in a jury trial, although no statute requires bifurcation.  The trial court has broad discretion to control the conduct of a criminal trial.  (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1048.)  To the extent evidence supporting a gang enhancement would be admissible at a trial determining a defendant's guilt, any inference of prejudice would be dispelled and bifurcation would be unnecessary.  (*Id*. at pp. 1049–1050.)

Given the overlapping evidence between the attempted murder and related allegations with the gang allegations, the trial court did not abuse its discretion in denying defendants' bifurcation motion.  We note all the parties, not just defendants as discussed in part IX.B, *ante*, but the prosecutor and trial court could not necessarily anticipate the overruling of *Gardeley*.  Although much of the gang evidence submitted by the prosecutor has been found inadmissible pursuant to *Sanchez* and *Elizalde*, it was still admissible at the time of this trial, and the trial court was following the law applicable at that time.  We do not find error in the trial court's ruling on defendants' bifurcation motion.

---

[*]See footnote, *ante*, page 1.

## XI.    Sentencing Issues*

Given our reversal of the gang allegations, the trial court will have to conduct a new sentencing hearing whether or not the People refile and prosecute defendants on those allegations.  Defendants and the People concede count 2, the burglary count, has to be stayed pursuant to section 654.  This change substantially alters the trial court's sentencing of all three defendants, clearly necessitating a new sentencing hearing.

Additionally, in his supplemental briefing, Martinez requests a resentencing hearing for the court to exercise its newfound discretion pursuant to Senate Bills 620 and 1393 to consider whether to strike his firearm and prior serious felony enhancements, respectively.  Senate Bill 620, signed into law on October 11, 2017, amended sections 12022.5 and 12022.53 to provide the trial court with discretion to dismiss, in furtherance of justice, firearm enhancements imposed pursuant to sections 12022.5, subdivision (c), and 12022.53, subdivision (h).  The new law took effect on January 1, 2018.  Senate Bill 1393, signed into law on September 30, 2018, amends sections 667 and 1385 to provide the trial court with discretion to dismiss, in furtherance of justice, five-year sentence enhancements imposed pursuant to section 667, subdivision (a)(1).  The new law became effective on January 1, 2019.  These laws are applicable to those parties, like defendants, whose appeals are not final on the law's effective date.  The People agree these laws apply retroactively to defendants and that at resentencing, the trial court should have an opportunity to consider whether to strike these enhancements.[11]

There are also several clerical errors in each defendant's abstract of judgment, however, new abstracts of judgment will need to be prepared after defendants are resentenced.

---

*See footnote, *ante*, page 1.

[11]We note Senate Bill No. 136 (2019–2020 Reg. Sess.) was signed into law and is scheduled to take effect January 1, 2020.  This bill has modified section 667.5.  The trial court may consider its applicability to any of the defendants at the time of resentencing.

## DISPOSITION

Defendants' convictions on count 5 and the jury's true findings on all the gang enhancements are reversed as to all three defendants. As to Medrano and Martinez only, the attempted murder convictions on count 1 are reversed. The verdicts on the remaining counts and enhancements are affirmed. The People may retry the defendants on counts 1 and 5, including the gang enhancement allegations. At any resentencing of the defendants, the trial court shall consider whether to exercise its new discretion pursuant to Senate Bills 620 and 1393, if applicable to any defendant.

_____
PEÑA, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
POOCHIGIAN, J.

80.